# 14-4455-cv

# United States Court of Appeals
## for the
## Second Circuit

◆❙◆

ALLIANZ RISK TRANSFER AG,

*Plaintiff,*

MARATHON STRUCTURED FINANCE FUND, LP, NEWSTAR FINANCIAL, INC.,
MUNICH RE CAPITAL MARKETS NEW YORK, INC.,

*Plaintiffs-Appellants,*

– v. –

PARAMOUNT PICTURES CORPORATION,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF and SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

PRYOR CASHMAN LLP
7 Times Square, 3rd Floor
New York, New York 10036
(212) 421-4100

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiffs-Appellants hereby certify that:

1. Marathon Structured Finance Fund, LP does not have a parent corporation and no publicly held corporation owns 10% or more of its membership interest.

2. NewStar Financial, Inc. does not have a parent corporation and no publicly held corporation owns 10% or more of its membership interest.

3. Munich Re Capital Markets New York, Inc. is wholly owned by Munich Reinsurance Company AG ("Munich Re") (through Munich American Holding Corporation). More than 10% of Munich Re is owned by the Harvey Investment Trust, the sole beneficiary of which is National Indemnity Company, which in turn is wholly owned by Berkshire Hathaway, Inc.

Dated: New York, New York
      March 16, 2015        PRYOR CASHMAN LLP

                      By:    */s/ James A. Janowitz*
                            James A. Janowitz
                            William L. Charron
                            Bryan T. Mohler
                            Benjamin S. Akley
                    7 Times Square
                    New York, New York 10036-6569
                    (212) 421-4100
                    *Attorneys for Plaintiffs-Appellants*

## **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ...........................................................1

QUESTIONS PRESENTED...................................................................1

STATEMENT OF THE CASE................................................................2

PROCEDURAL POSTURE .................................................................6

STATEMENT OF FACTS ...................................................................7

    A.  The Risk Mitigation Technique
        Known As "Territorial Sales"..................................................7

    B.  Paramount's Creation Of Melrose
        And Abandonment Of Territorial Sales..................................10

    C.  The Trial Court Erroneously Found That Paramount's
        Territorial Sales Strategy Remained Unchanged After 2003 ...............15

    D.  Paramount's Efforts To Keep Its Abandonment Of Territorial
        Sales A Secret And To Mislead Investors Into Thinking
        That Its Strategy Of Territorial Sales Remained Unchanged ...............21

    E.  The Melrose PPM Is Materially False And Misleading.....................25

    F.  Appellants Actually And Justifiably
        Relied On The PPM And The HDS........................................30

    G.  There Are No Waivers Or Disclaimers
        That Bar Appellants' Claims .............................................35

SUMMARY OF ARGUMENT ...............................................................38

STANDARD OF REVIEW ...................................................................39

## **TABLE OF CONTENTS**

ARGUMENT ..................................................................................40

I.   THE TRIAL COURT ERRED IN FINDING THAT A WAIVER
AND DISCLAIMERS BARRED APPELLANTS' CLAIMS....................40

    A.  Appellants Did Not Waive Their Claims...............................................40

    B.  Paramount Did Not Disclaim Its Liability For Fraud...........................42

II.  THE TRIAL COURT ERRED IN FAILING TO FIND FALSITY ............45

III. THE TRIAL COURT ERRED IN
FAILING TO FIND MATERIALITY .......................................................45

IV. THE TRIAL COURT ERRED IN FAILING TO FIND ACTIONABLE
MISREPRESENTATIONS AND OMISSIONS IN THE PPM .................47

V.  THE TRIAL COURT ERRED IN FAILING TO FIND SCIENTER .........50

VI. THE TRIAL COURT ERRED IN FAILING TO FIND RELIANCE.........54

    A.  Reliance Should Have Been Presumed By The Trial Court.................54

    B.  The Trial Court Erred In Finding No Actual Reliance ..........................55

    C.  The Trial Court Erred In Finding No Justifiable Reliance ...................57

VII. THE TRIAL COURT ERRED IN
FAILING TO FIND LOSS CAUSATION ..................................................59

VIII. THE TRIAL COURT ERRED IN AWARDING
JUDGMENT TO PARAMOUNT ON APPELLANTS'
COMMON LAW FRAUD, FRAUDULENT
CONCEALMENT AND UNJUST ENRICHMENT CLAIMS .................61

    A.  The Trial Court's "Fraud" Ruling Should Be Reversed.......................61

# <u>TABLE OF CONTENTS</u>

B. The Trial Court's "Fraudulent Concealment" Ruling Should Be Reversed ........................................... 62

C. The Trial Court's "Unjust Enrichment" Ruling Should Be Reversed ........................................... 63

CONCLUSION ........................................................................................ 64

## TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                             <u>**PAGE(s)**</u>

*AIG Global Security Lending Corp. v. Banc of America Security LLC*,
    646 F. Supp. 2d 385 (S.D.N.Y. 2009), *aff,d*, 386 F. App,x 5
    (2d Cir. 2010)...............................................................................59

*AUSA Life Insurance Co. v. Ernst & Young*,
    206 F.3d 202 (2d Cir. 2000) ................................................50, 55

*Abu Dhabi Commercial Bank v. Morgan Stanley& Co.*,
    888 F. Supp. 2d 431 (S.D.N.Y. 2012) ........................................60

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972)...................................................................54

*Austrian Airlines Oesterreichishe Luftverkehrs AG v. UT Fin. Corp.*,
    336 F. App,x 39 (2d Cir. 2009) .................................................39

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1998)...................................................................45

*Brazos River Authority v. GE Ionics, Inc.*,
    469 F.3d 416 (5th Cir. 2006) .....................................................52

*Brown v. E.F. Hutton Group, Inc.*,
    991 F.2d 1020 (2d Cir. 1993) ...............................................45, 58

*Capital Ventures International v. Republic of Argentina*,
    652 F.3d 266 (2d Cir. 2011) ......................................................44

*Castellano v. Young & Rubicam, Inc.*,
    257 F.3d 171 (2d Cir. 2001) ......................................................59

*Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*,
    343 F.3d 189 (2d Cir. 2003) ......................................................59

*Fogarazzo v. Lehman Brothers*,
    232 F.R.D. 176 (S.D.N.Y. 2005)...........................................48, 54

iv

## CASES                                                                    PAGE(s)

*Gould v. Winstar Communications, Inc.*,
    692 F.3d 148 (2d Cir. 2012) ......................................................... 50

*Herman & Maclean v. Huddleston*,
    459 U.S. 375 (1983) .................................................................... 50

*JP Morgan Chase Bank v. Winnick*,
    350 F. Supp. 2d 393 (S.D.N.Y. 2004) ...................................... 62, 63

*Janus Capital Group, Inc. v. First Derivative Traders*,
    131 S. Ct. 2296 (2011) ............................................................. 7, 38

*Kalisch-Jarcho, Inc. v. New York*,
    58 N.Y.2d 377 (1983) ................................................................... 42

*Koch v. Greenberg*
    14 F. Supp. 3d 247 (S.D.N.Y. 2014) ................................... 61, 62, 63

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*,
    478 F. App'x 679 (2d Cir. 2012) ................................................. 63

*LaSalle Bank National Association v. Nomura Asset Capital Corp.*,
    424 F.3d 195 (2d Cir. 2005) ....................................................... 40

*McMahan & Co. v. Wherehouse Entertainment, Inc.*,
    859 F. Supp. 743 (S.D.N.Y. 1994) ............................................... 55

*McMahan & Co. v. Wherehouse Entertainment, Inc.*,
    900 F.2d 576 (2d Cir. 1990) ....................................................... 48

*In re Parmalat Security Litigation*,
    Nos. 04 Civ. 0030, 04 MD 1653 (LAK), 2008 U.S. Dist. LEXIS
    64296 (S.D.N.Y. Aug. 20, 2008) ............................................ 49, 54

## **CASES**                                                    **PAGE(s)**

*Presley v. United States Postal Service*,
    317 F.3d 167 (2nd Cir. 2003) ....................................................................52

*In re Prudential Security Ltd. Partnerships Litigation*,
    930 F. Supp. 68 (S.D.N.Y. 1996) ........................................................49, 59

*Pure Earth, Inc. v. Call*,
    531 F. App'x 256 (3d Cir. 2013) ................................................................60

*Quintel Corp., N.V. v. Citibank, N.A.*,
    596 F. Supp. 797 (S.D.N.Y. 1984) ............................................................44

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ......................................................................59

*Royal America Managers, Inc. v. IRC Holding Corp.*,
    885 F.2d 1011 (2d Cir. 1989) ....................................................................58

*SEC v. Syron*,
    934 F. Supp. 2d 609 (S.D.N.Y. 2013) ......................................................48

*Sara Lee Corp. v. Kraft Foods, Inc.*,
    276 F.R.D. 500 (N.D. Ill. 2011) ................................................................52

*Sciarretta v. Lincoln National Life Insurance Co.*,
    No. 13-12559, 2015 U.S. App. LEXIS 2864
    (11th Cir. Feb. 26, 2015) ...........................................................................52

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
    No. 12-4437-cv, 2015 U.S. App. LEXIS 3034
    (2d Cir. Feb. 27, 2015).................................................................41, 42, 44

*In re Smith Barney Transfer Agent Litigation*,
    290 F.R.D. 42 (S.D.N.Y. 2013) ................................................................48

*Travellers International, A.G. v. Trans World Airlines*,
    41 F.3d 1570 (2d Cir. 1994) ......................................................................39

**CASES** PAGE(s)

*Turkish v. Kasenetz,*
    27 F.3d 23 (2d Cir. 1994) .................................................................42

*Union Pump Co. v. Centrifugal Technology, Inc.,*
    404 F. App'x 899 (5th Cir. 2010*)*.................................................52

*United States v. Martoma,*
    993 F. Supp. 2d 452 (S.D.N.Y. 2014) .........................................60

*United States v. Schlisser,*
    168 F. App'x 483 (2d Cir. 2006) ..................................................44

*VKK Corp. v. NFL,*
    244 F.3d 114 (2d Cir. 2001) .........................................................43

*In re WorldCom, Inc. Security Litigation,*
    219 F.R.D. 267 (S.D.N.Y. 2003)..........................................48, 54

**STATUTES**

28 U.S.C. § 1291 .............................................................................1

28 U.S.C. §§ 1331 ...........................................................................1

28 U.S.C. § 1367(a) ........................................................................1

Fed. R. Civ. P. 52(c)................................................................*passim*

## JURISDICTIONAL STATEMENT

Plaintiffs-appellants Marathon Structured Finance Fund, LP, NewStar Financial, Inc., and Munich Re Capital Markets New York, Inc. (collectively, "Appellants"), by their attorneys, Pryor Cashman LLP, appeal from a Decision and Judgment (the "Decision") by the United States District Court for the Southern District of New York (Hon. Katherine B. Forrest), entered on October 31, 2014, in favor of Defendant-appellee Paramount Pictures Corporation ("Paramount") on all claims. Subject matter jurisdiction in the trial court was proper under 28 U.S.C. §§ 1331 and 1367(a). Appellants timely filed a Notice of Appeal of the Judgment on December 1, 2014. This is an appeal from a final judgment under 28 U.S.C. § 1291.

## QUESTIONS PRESENTED

1.     Did the trial court's clear misapprehension of the evidence concerning risk mitigation techniques employed by Paramount in a film financing investment cause the trial court to make a series of erroneous findings about each of the elements of Appellants' federal securities fraud, common law fraud, and unjust enrichment claims?

2.     Did the trial court err in applying its own, unsupported understanding of contract terms in lieu of applying traditional contract interpretation principles to find that Appellants' claims were barred by a contractual waiver and disclaimers?

## STATEMENT OF THE CASE

This is a case involving the area of film finance of major motion pictures, a subject which is not common knowledge. It concerns various techniques of film financing and risk mitigation.

This action had proceeded for over six years before Judge Thomas Griesa. Judge Griesa denied many lengthy dispositive motions made by Paramount on the pleadings and on the merits. Judge Katherine Forrest inherited the action (without explanation) on October 20, 2014 at approximately, 11 a.m., and proceeded with the trial at 9 a.m. the following morning.

Judge Forrest dismissed the case pursuant to Fed. R. Civ. P. 52(c) after a two-week trial. Judge Forrest found in her 62-page decision, delivered five minutes after the close of Rule 52(c) oral arguments, that Appellants' claims did not "make a lot of sense" to her "from a business perspective." (SPA-2-18.)

The record shows that Judge Forrest's intuition and finding as to the "business sense" of Appellants' claims was unsupported by evidence and, indeed, contradicted by the only evidence on point. Moreover, a reading of Judge Forrest's decision shows that as a result of her mistaken understanding of the business circumstances of the claims, she failed to conduct the proper factual and legal analyses.

Judge Forrest decided at the outset that Appellants' essential allegation that Paramount had secretly changed an important business strategy, thereby materially increasing the risk of Appellants' investments, did not "make a lot of sense" to her. (*Id.*) Judge Forrest then reasoned backwards to find that Paramount did not defraud Appellants or engage in unconscionable behavior. Judge Forrest also substituted her own understanding of essential contractual terms to find the existence of a "waiver" and "disclaimers" that she found barred Appellants' claims, without analyzing those terms according to controlling contract law principles and the evidence.

The essence of Appellants' claims is that Paramount represented to Appellants that it would continue to conduct its business with respect to the financing of motion pictures as it had done in the past. The trial court correctly identified the issue as follows:

… plaintiffs sought assurances that business would continue as usual.

(SPA-8, Tr.1617:15-16.)

What Appellants understood to be the continuation of "business as usual" was the use by Paramount of a risk mitigation technique known as "territorial sales" of film distribution rights, which was a signature risk mitigation technique of Paramount's. Pursuant to this well-known technique, Paramount would limit the

3

performance risk of poorly performing films by licensing certain films in territories outside of the United States for a non-refundable payment. As a result, if the film performed poorly, the foreign distributor would suffer the loss associated with the cost of acquiring the rights and distributing the film but Paramount would eliminate that risk as a result of the receipt of the non-refundable payment.

Appellants demonstrated that in the five-year period prior to their investment, as reflected in data provided to investors by Paramount in a "Historical Data Set" ("HDS"), Paramount had territorially sold 24.1% of the aggregate production cost of its films.[1] Appellants also demonstrated that only 3.2% of the aggregate production cost of films in Appellants' investment slate (the "Melrose Slate") had been offset by territorial sales: *a drop of over 85%.* (A-800-01.)

The trial court's Decision is hinged on the finding that this decline in territorial selling reflected "no fundamental change in business strategy that would rise to the level of not business as usual." (SPA-8, Tr.1617:21-23.) To reach this finding, the trial court erroneously compared only anecdotally the quantum of territorial sales in certain years of the HDS to certain other years covered by the Melrose Slate. Such an analysis, failing to take into account the experience of the entire 25-film Melrose Slate, could not (and did not) yield a meaningful result.

---

[1] The HDS was provided by Paramount to investors to evaluate the investment.

Moreover, to the extent that the trial court attempted to compare the HDS to the Melrose Slate with respect to territorial sales, it relied on the wrong data.

Paramount, in an attempt to obscure the analysis of territorial sales, divided transactions with the same economic effect into two separate categories, thereby hoping to minimize the appearance of the decline in territorial sales. Specifically, Paramount, in its demonstrative exhibits, divided the relevant transactions into the categories of "territorial sales" and "split rights" deals. (A-802-09.) However, the testimony of Paramount's own witness at trial, Karen Magid, Esq., established that the economic effect of the transactions denominated as "territorial sales" or "split rights" deals is identical. Consequently, the trial court entered a stipulation which provided that in analyzing the level of "territorial sales," three categories would be added together: foreign pre-sales, split rights deals, and domestic acquisitions.

When the trial court engaged in its own anecdotal review of "territorial sales," however, it failed to take account of the equivalence of foreign pre-sales and split rights deals (in particular) and, therefore, based its findings on data that did not accurately reflect the level of territorial sales. (A-649-50, Tr.1421:17-1422:3.) As a result, the trial court erroneously found the levels of territorial sales in the Melrose Slate to be not materially different from the territorial sales levels in the HDS. That mistake infects the Decision throughout.

Appellants further demonstrated that Paramount – knowing that the Melrose transaction would protect it from downside risk, while *also* allowing Paramount to retain a greater share of profits from films performing well internationally – decided to abandon its territorial sales strategy in favor of the Melrose transaction *prior* to issuance of the private placement memorandum ("PPM").

Paramount elected not to inform Appellants of this important change in co-financing strategy, and to affirmatively misrepresent and mislead Appellants into believing that territorial sales would continue "in much the same manner as we always have." (A-2088.)

The Decision shows that the trial court could not have decided the issue presented correctly (did Paramount continue its territorial sales strategy "as usual") because the court misunderstood the facts and economics of Appellants' investment in the Melrose Slate. The trial court's judgment for Paramount under Rule 52(c) should be reversed.

## **PROCEDURAL POSTURE**

Appellants commenced this action on or about December 2, 2008. (A-5.)

Following a nearly two-week trial that commenced on October 21, 2014 (which included live testimony by 8 witnesses, 15 designated depositions, and 257 exhibits), and several hours of oral argument on October 30, 2014 further to Paramount's motion for judgment on partial findings under Rule 52(c), Judge

6

Forrest read from the bench a 62-transcript-page, 90-minute ruling granting Paramount's motion and awarding Paramount judgment on all of Appellants' claims. (SPA-2-18, Tr.1592:16-1654:20.) Judge Forrest ruled in Paramount's favor on every issue, save for a question raised by Paramount about the significance of *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), which Judge Griesa had previously twice rejected and which Judge Forrest declined to disturb. (SPA-6, 1609:17-18.)

## STATEMENT OF FACTS

### A.  The Risk Mitigation Technique Known As "Territorial Sales"

Paramount is what is known as a "major" film studio that makes "big budget" motion pictures for both domestic and international release. (A-160, Tr.133:12-18, 134:5-6; A-162, Tr.144:21-25; A-171, Tr.180:5-17.)

Prior to 2004, Paramount had been well known for being a financially conservative and risk-averse studio. (A-370-71, Tr.701:22-702:14; A-1847; A-3275; A-3300; A-3308.) Paramount was particularly known for its territorial sales of film rights. (A-975, Tr.119:11-21; A-164, Tr.150:20-151:17.) As Paramount's then-Chairman, Sherry Lansing, recognized, territorial sales were an important part of Paramount's philosophy of making an "arrangement to protect the downside risk on every film." (A-1038; Tr.42:4-18; A-1053, Tr.104:3-4; A-3312-13.) Paramount's head of the Motion Picture Legal Department testified that territorial

sales *eliminate* upside and downside risk in a particular territory. (A-641, Tr.1386:14-21.)

The Melrose Slate was a poorly performing slate of films. (A-3953-54.) Appellants' damages expert demonstrated that Paramount's abandonment of territorial sales caused Appellants to suffer substantial and measurable losses. (A-3815.) [2]

The evidence at trial was uncontroverted that, between 1998 and 2003, Paramount used territorial sales to offset 24.1% of its aggregate film production cost. (A-2587-94; A-3850-52; A-1890-1955.) As explained below, in attracting investors for Melrose, Paramount promoted its co-financing practices during this period of time as illustrative of its co-financing strategy for Melrose. This is the essence of Appellants' fraud claims.

Between 1998 and 2003, Paramount entered into territorial sales where third parties, including Lakeshore Entertainment ("Lakeshore"), Mutual Entertainment, and others, obtained the foreign rights to films released domestically by Paramount. (A-1890-1955; A-4193-4205.)

During this period of time, Paramount also employed risk mitigation and co-financing techniques that did not involve sales of foreign rights for non-refundable advances. For example, Paramount took advantage of tax incentive programs in

---

[2] Appellants' damages expert did not testify because the trial was bifurcated but his report was accepted into evidence on the issue of loss causation. (A-691, Tr.1444:5-25.)

the United Kingdom and Germany. (A-2587-94; A-3950-52; A-1890-1955.) Paramount also engaged in what are known as "shared pot" deals, in which Paramount co-financed films with other studios, with one studio distributing a film domestically and the other distributing internationally. (*Id.*) Such arrangements required both studios to share the total, worldwide potential upside and downside risk on a 50/50 basis. (A-640-41, Tr.1385:15-1386:18.)

With respect to deals involving risk mitigation through the sales of foreign rights, Paramount's witness at trial testified that this risk mitigation technique was called by different names: sometimes these deals were known as "territorial sales" and sometimes they were known as "split rights" deals. (A-631, Tr.1347:5-12; A-165, Tr.153:1-20.) Regardless of the nomenclature, Paramount's witness testified that the economic effect of territorial sales and split rights deals was the same. (A-641, Tr.1387:14-18; A-632, Tr.1351:4-7; A-641, Tr.1388:3-8.) Paramount's witness additionally testified that with respect to deals where Paramount acquired only domestic distribution rights to films produced by other studios (known as "domestic acquisitions"), the risk mitigation effect was also the same. (A-642, Tr.1390:18-1391:2; A-632, Tr.:1351:4-7.)

It was stipulated between the parties at trial that "territorial sales" include "foreign pre-sales," "split rights" deals, and "domestic acquisitions" because they all have the same economic effect. (A-649-50, Tr.1421:17-1422:3.) All three

mitigate foreign performance risk to zero. (A-641, Tr.1387:14-18, Tr.1388:3-8; A-632, Tr.1351:4-7; A-642, Tr.1390:18-1391:2.) In contrast, in a "shared pot deal," each studio continues to bear the entire risk of loss with respect to films that perform poorly internationally. (A-243, Tr.326:17-327:8.) It is undisputed that territorial sales and shared pot deals are not fungible (contrary to the trial court's misapprehension, as discussed more below). (A-641, Tr.1386:4-1388:8; A-164, Tr.152:6-25.)

**B.** **Paramount's Creation Of Melrose**
**And Abandonment Of Territorial Sales**

In or about late-2002, Paramount conceived the Melrose transaction, through which it would offer both equity and debt investments in a "slate" of motion pictures to be produced and released by Paramount beginning in 2004. (A-1172, Tr.58:2-59:23; A-360-61, Tr.661:17-662:12; A-2451-52; A-3270-74; A-3281; A-4239-4329.) As structured by Paramount and its placement agent, Merrill Lynch, the total number of films that would be included in the "Melrose Slate" would be determined by the size of the total investment pool and the production cost of the films. When the investment dollars to finance the production of films ran out, the slate would be complete. (A-427, Tr.801:15-20.) The Melrose Slate ultimately comprised 25 films. (A-3810-11.)

The evidence showed that, coincident with Paramount's creation of Melrose, Paramount had also privately decided to make bigger budget movies and to try to

retain more of the potential "upside" from those films by reducing territorial sales. Should that gamble fail (*i.e.*, should the Melrose Slate "flop"), then Paramount and the Melrose investors would all lose money, but *Paramount* would mitigate its own risk of loss by the amount of the Melrose investors' loss.  (*See* A-151, Tr.98:25-99:10; A-412, Tr.740:17-741:9; A-177, Tr.201:10-202:17; A-641, Tr.1386:13-21; A-1308, Tr.90:20-91:21.)   This was revealed most directly in three pieces of evidence.

First, in or about mid-2003, Paramount negotiated a new agreement with Lakeshore (one of Paramount's primary counterparties in territorial sales).  (A-1624-25.)  Paramount's new agreement with Lakeshore – which it did not reveal to Appellants – made clear that, unlike its prior agreement, Paramount would "be retaining worldwide distribution rights (with the exception of three territories) as compared with our retention of only domestic distribution rights under the current Lakeshore arrangement."  (A-1624.)

Second, on or about March 10, 2004, during a board meeting of Viacom, Inc. (the parent company of Paramount), Paramount's senior executives gave a PowerPoint presentation making clear that the "Impact of Financing" from the

Melrose transaction would be for Paramount to "Retain More Foreign Rights" than Paramount had historically done.  (A-2002-04; A-3915.)[3]

Paramount's witnesses who were involved in preparing the PowerPoint or who attended its presentation uniformly claimed that s/he could not recall what the words "Retain More Foreign Rights" meant.  (A-1091-92, Tr.63:7-67:10; A-1050, Tr.92:17-93:14;  A-881-82,  Tr.108:13-109:13;  A-1074,  Tr.79:2-80:15;  A-1008, Tr.75:12-16.)   As with the Paramount executives who could not remember their efforts to pre-sell films, the trial court accepted Paramount's witnesses' professed ignorance and found that "there is no one who makes the retain more foreign rights PowerPoint into a smoking gun or to indicate that it reveals a fraud."  (SPA-12, Tr.1632:5-14.)

The trial court's comments about the PowerPoint presentation overlook the importance of "foreign rights" in risk mitigation.  The *only* form of risk mitigation at issue in this case is the sale of foreign territorial rights.  The decision to "retain,"

---

[3] The PowerPoint set out a number of bullet points under the heading "Features Strategy" as follows:
- Remain Careful On Costs
  - Big Budget Films
- Continue Financing
- Impact of Financing
  - Merrill Lynch
- Retain More Foreign Rights
- Increase The Number Of Our Releases To Approximately 16 To 18 Per Year
- Remain Focused On Profitability Not Market Share
- Change Our Mix Of Films

(A-3915.)

as opposed to sell, reflects a strategic decision by Paramount and belies the unsupported narrative that Paramount continued its "business as usual." On the other hand, the decision to "retain more foreign rights" is consistent with, and explains, the decline in territorial sales, which the trial court failed to perceive in its factual analysis.

Third, one month after Paramount's PowerPoint presentation to the Viacom board, in or about April 2004, Paramount's chief financial officer, Mark Badagliacca, projected Paramount's 2004 profit for the films in the Melrose Slate to be $4.98 million without the Melrose deal, and $37.53 million with the Melrose deal. (A-2125-32.) The same analysis showed that the Melrose investors were projected to lose $32.55 million in 2004, exactly the benefit that Paramount received from the investment. (*Id.*) The Melrose deal, in other words, was a zero-sum game for Paramount (although Badagliacca claimed that, even though his office routinely performs such analyses, he could not recall or understand what he meant by his calculations and reporting). (A-870-71, Tr.64:11-67:12.) Paramount did not share this analysis with Appellants, either. The Decision does not address this evidence.

Further proving that Paramount had decided by early 2004 to cease its historical territorial sales practices, the evidence showed that Paramount territorially sold only four films in the Melrose Slate, in deals that closed well prior

to the issuance of the PPM in July 2004: *Suspect Zero* (closed June 5, 2002); *Sky Captain* (closed June 19, 2003); *The Weather Man* (closed November 22, 2003); and *Aeon Flux* (closed May 13, 2004). (A-2630-2703; A-1690-98, A-1586-95, A-1626-36.)[4]

Furthermore, Paramount could not produce a single document attesting to any efforts to territorially sell any other films in the Melrose Slate. (A-645, Tr.1403:12-17.) The only evidence that Paramount offered was conclusory and wholly non-specific testimony by Paramount's executives that they believe efforts to territorially sell other films in the Melrose Slate were made but were simply unsuccessful, which the trial court accepted (stating: "I have no information that is not true. The fact that nothing happened does not mean that nothing was tried."). (SPA-9, Tr.1618:16-1619:9; SPA-12, Tr.1630:2-12; SPA-13, Tr.1634:4-9.)

Nevertheless, none of Paramount's witnesses could explain or purport to recall why Paramount, a highly effective territorial seller of major motion pictures between 1998 and 2003, could not find a single territorial sale to close after Paramount issued the Melrose PPM in July 2004. (A-1096-97, Tr.83:6-88:12; A-127175, Tr.96:14-109:10; A-1275-83, Tr.112:24-142:11; A-1005-06, Tr.64:19-67:20; A-1052, Tr.101:9-102:18.) It is clear that territorial sale opportunities for

---

[4] Paramount contended that *Mission: Impossible III* ("*Mi3*") was pre-sold internationally in May 2006, after the PPM; however, the evidence revealed that Paramount actually only sold the exclusive Japanese advertising rights for *Mi3* to an ad agency in Japan for payment of a recoupable advance, and that the ad agency acquired no rights with respect to the film at all. (A-3729-61.) That was not a territorial sale of the film.

the major motion pictures in the Melrose Slate abounded notwithstanding Paramount's sudden inability to find them. (A-163, Tr.148:13-18; A-1052, Tr.101:9-102:18; A-996-97, Tr.26:20-29:12.) The evidence reflects an 85% drop in territorial sales of films released by Paramount between 1998 and 2003, and films in the Melrose Slate released between 2004 and 2006. (A-2587-93; A-3950-52; A-1889-1999; A-4212-18; A-3762-3809; A-3810-11.)

## C. The Trial Court Erroneously Found That Paramount's Territorial Sales Strategy Remained Unchanged After 2003

The trial court found that "[t]here was no fundamental change in business strategy [at Paramount] that would rise to the level of not business as usual." (SPA-8, Tr.1617:21-23.) This finding is clearly erroneous and based on the trial court conflating other movie-making activities with territorial sales.

In supporting its finding, the trial court explained:

[T]here are many forms of risk mitigation, as I've said, and they're highly variable. It is true that Paramount did opportunistically enter into territorial sales, and it did so with respect to the Melrose Slate…. Making a good film, for instance, with solid stars who are known to the box office to be a good draw is a form of risk mitigation…. [P]laintiffs sought assurances that business would continue as usual. And so it seems by the evidence, and the Court so finds, that it did. Paramount continued to make and market movies. It did so according to its best business judgment at the time. That's the evidence in the record. That's what they committed to do. That's what they did…. To the extent that plaintiffs are alleging and have asserted that Paramount failed to engage in any reasonable risk mitigation as they had in the past, that's also disproven by the record. Indeed, the Melrose LLC … was itself a form of risk mitigation.

15

(SPA-8-9, Tr.1615:23-1619:9.)

The trial court's opinions about risk mitigation generally find no support in the record. Its opinion that making a "good film" with "solid stars" is risk mitigation confuses the basic activity of making films with an attempt to mitigate the risk of that activity. It embodies the simple advice, applicable to all forms of human activity, to do things carefully and well.

To support the finding that Paramount continued its "business as usual," the trial court observed that Paramount continued to make and market movies and did so according to its best judgment at the time. This observation misses the mark. It focuses only on Paramount's continuation in the movie business but does not address the one issue in the case – risk mitigation through territorial presales.

The trial court's comment that there are many forms of risk mitigation and "they're highly variable," highlights the court's failure to analyze the types and quantum of risk mitigation employed by Paramount. This failure is striking in the trial court's opinion that there is a lack of falsity in Paramount's representations and that Paramount conducted its "business as usual."

At trial, both Appellants and Paramount employed demonstrative exhibits ("Court Exhibits") based upon admitted evidence showing the amount of risk mitigation according to various techniques. (A-800-09.) Both Appellants and

16

Paramount compared risk mitigation as reflected by the HDS to risk mitigation in the Melrose Slate. (*Id.*)

Paramount's demonstratives ("Court Exhibits 4-11") separately identified certain "territorial sales" and other "split rights" deals to make the number of "territorial sales" in the HDS appear lower – and thus closer to the meager level of territorial sales in the Melrose Slate despite the fact that Paramount's own internal documents make no such distinction. (*Id.; A-2587-93.*) Pursuant to the stipulation between the parties it was agreed that split rights deals, foreign pre-sales, and domestic acquisition deals were *all* "territorial sales." (A-649-50, Tr.1421:17-1422:3.) Thus, Paramount's Court Exhibits 4-11 were all misleading and belied by the parties' stipulation.

Nevertheless, the trial court relied on Court Exhibits 4-11 in making the following critical findings (which underpin the Decision):

> Those documents together show a high degree of variability of type and amount of the various kinds of co-financing. They show no territorial sales in 1998, only a few in 1999, 2000 has no shared pot, a few territorial. The Melrose slate 2004 is ahead or at least not particularly different from 1998. 2006 does in fact have some foreign presales for the Melrose slate.

(A-736, 1622:15-21.)[5]

---

[5] The trial court relied on Court Exhibits 4-11 and the admitted exhibits underlying those Court Exhibits without observing that the Court Exhibits failed to reflect the parties' stipulation. (A-736, 1622:15-21.)

The trial court's first finding of fact, that the evidence (based on the misleading Court Exhibits 4-11) shows "no territorial sales in 1998," is incorrect. Appellants' contrary demonstrative, "Court Exhibit 3," which *does* adhere to the parties' stipulation, shows territorial sales of 7.75% of gross production cost of all of the films in 1998. (A-800-09.)[6]

The trial court's next finding of fact, that there were "only a few [territorial sales] in 1999" based upon the misrepresentative Court Exhibits 4-11, is likewise incorrect. Appellants' Court Exhibit 3 accurately shows territorial sales of 16.81% of the gross production cost of all of the films released in 1999 (an increase of over 100% from 1998). (A-800-09.)

The trial court's next finding, that 2000 had "no shared pot" and only "a few territorial" sales, is both inapt and incorrect. It is uncontroverted that shared pot deals are qualitatively different from territorial sales and thus irrelevant to this case. (A-243, Tr.326:17-327:8; A-641, Tr.1386:4-1388:8; A-164, Tr.152:6-25.) Moreover, Court Exhibit 3 shows territorial sales of 34.69% of the gross production cost of all of the films released in 2000 (another 100% increase from the prior year). (A-800-01.)

---

[6] Consistent with Paramount's own internal treatment of territorial sales on its books, Court Exhibit 3 treats the value of territorial sales for both the HDS and the Melrose Slate as percentages of the films' gross production cost. (A-2587-93; A-3950-52; A-4212-18; A-1889-1999.) In contrast with its own internal treatment, Paramount's Court Exhibits 4-11 treat the value of territorial sales merely as raw numbers and without linking them to production cost (which does not reflect their economic impact). (A-802-09.)

The trial court's findings then ignore years 2001-2003 (the remainder of the HDS), and thus ignore the fact that territorial sales remained at robust levels in each of those years (36.69% of the gross production cost of all of the films released in 2001; 21.73% in 2002; and 30.23% in 2003). (*Id.*) As Court Exhibit 3 accurately shows, territorial sales averaged 24.1% of the gross production cost of all of the films in the HDS. (*Id.*)

The trial court's analysis of the Melrose Slate is similarly flawed. The trial court did not analyze the Melrose Slate in total but merely observed anecdotally – and incorrectly – that in 2004 the Melrose Slate was "ahead or at least not particularly different from 1998." In fact, as Court Exhibit 3 shows, territorial sales totaled 4.6% in 2004, compared to 7.75% in 1998. (*Id.*)

The trial court's further anecdotal observation that "2006 does in fact have some foreign presales" (1.1% according to Court Exhibit 3), does not support the trial court's ultimate conclusion that Paramount's territorial sales practices for the Melrose Slate reflected "business as usual."

To buttress its finding that Paramount's risk-mitigation strategy had remained "unchanged," the trial court additionally relied upon its own, unsupported and mistaken business intuition that it "doesn't make a lot of sense" that Paramount would have changed its territorial sales strategy without telling investors.

The Decision states:

> From a business perspective, I would note this doesn't make a lot of sense. If Paramount had bound itself to foreign presales, that does seem to fly in the face of good negotiating strategy, because everybody in the world would then know that you had given up your negotiating leverage and that they would have to obtain a certain number of foreign presales in certain territories because they would be so bound. So to bind oneself to taking that kind of strategic action doesn't make a lot of sense. Binding Paramount to have to achieve a business arrangement with third parties would have handed them certain leverage and changed dynamics, but the alleged coverup also doesn't make a lot of sense. It doesn't make a lot of sense to hide only one small relatively small piece, although a somewhat big dollar amount, depending on how you count it, in a litany of other pieces.

(SPA-4, Tr.1600:22-1601:11.)

There is no support for the trial court's beliefs about "negotiating leverage" and "business dynamics" with respect to territorial sales of major motion pictures. To the contrary: the record is undisputed that film studios can and have successfully based business plans around territorially selling *100%* of a studio's films. (A-996-97, Tr.26:20-29:12; A-160, Tr.133:12-23.) [7] Indeed, it is uncontroverted that between 1998-2003, Paramount itself territorially sold its films in large percentages without encountering a "negotiating leverage" problem.

---

[7] Robert Friedman, Paramount's head of distribution at the time of the Melrose transaction, left Paramount to begin a new studio which would distribute its films outside the U.S. based upon this 100% territorial sales strategy. (A-996-97, Tr.26:20-29:12; A-160, Tr.133:12-23.) That studio is now known as Lionsgate, where Mr. Friedman is the head of distribution employing the territorial sales model in releasing such blockbusters as *The Hunger Games*. (A-998, Tr.33:22-34:10.)

The trial court ignored this evidence in favor of its own, general business intuition, and thereupon credited the unsupported testimony of Paramount's witnesses that Paramount's territorial sales strategy and practices had remained unchanged between the HDS and the Melrose Slate because, to the trial court, "it doesn't make sense" that Paramount would have wanted to change those practices. (SPA-4, Tr.1600:22-1601:11.)

**D.  Paramount's Efforts To Keep Its Abandonment Of Territorial Sales A Secret And To Mislead Investors Into Thinking That Its Strategy Of Territorial Sales Remained Unchanged**

The March 2004 Viacom board meeting became the subject of a March 18, 2004 *Wall Street Journal* article, entitled: "Paramount's New Mantra: Taking Risks Is Healthy." (A-2084-85.) The references in this article to Paramount taking on more risk, contrary to its historically risk-averse practices, prompted the head of Merrill Lynch's deal team for Melrose, Peter Hoffman, to urgently seek assurance from Paramount that it was *not* changing its co-financing and risk mitigation strategies. (A-2090-91; A-417, Tr.760:22-761:19.)

Tom McGrath, a senior Viacom executive, whose office was responsible for the Melrose transaction and who helped prepare the PowerPoint presentation, responded in writing to Hoffman's inquiry as follows (expecting that Hoffman would relay this same message to Melrose's potential investors):

> While not pretending to understand why stories get written or why a writer may choose to make a specific point of view, *I do not think it*

21

> *would be fair to conclude from that story or otherwise that there is any fundamental shift in Paramount's production strategy as it relates to risk management and deal making.* The article purports to reference a board meeting held last week that the writer did not attend. I was not present, but *I was intimately involved in preparing the materials for that meeting and they do not suggest fundamental changes in strategy*. To the contrary, the materials specifically make the following points, which I have carefully redacted from the complete PowerPoint: "Remain Careful on Costs … Continue Financing … Retain More Foreign Rights … Remain Focused on Profitability, Not Market Share."

(A-2088 (emphases supplied).) Conspicuously absent from McGrath's response was the language from the PowerPoint about the "Impact of Financing" to Paramount from the Melrose transaction, which is the language immediately preceding Paramount's next point that it would "Retain More Foreign Rights." (A-2088; A-3915.)

McGrath's written response to Hoffman continued:

> Going forward, Paramount's intention is to maintain a balanced slate of films with an overall goal of not increasing our net investment much beyond *the historical levels*, adjusted for underlying industry growth. *The intention is to continue to enter into split rights, co-financing, straight equity deals, territorial sales and tax driven deals in much the same manner as we always have.*

(A-2088 (emphases supplied).)

Thus, in order to lull potential investors, McGrath deliberately misrepresented Paramount's intentions regarding its co-financing and risk mitigation strategy with respect to territorial sales. The trial court acknowledged this written communication from McGrath in evaluating the element of scienter,

but nonetheless found it "so vague and general" and "certainly insufficient standing alone to establish an intent to defraud." (SPA-15, Tr.1642:11-20.) Once again, the trial court was reasoning backwards from its finding that nothing had changed with respect to territorial sales: *i.e.*, if there was no change, there could be no scienter.

In finding that Paramount had not materially omitted any information about its decision to strategically change its territorial sales practices, the trial court also found that Paramount "had publicly came [sic] out in favor of additional risk" in the *Wall Street Journal* article. (SPA-13, Tr.1634:4-9.) This finding is problematic and clearly erroneous for two reasons: first, *immediately* before making this finding, the trial court inconsistently found that "there was no change of business strategy in 2004" by Paramount with respect to its territorial sales and co-financing practices (*id.*); and second, the trial court's finding was directly at odds with McGrath's statement that the *Wall Street Journal* article should *not* be read by investors even to "suggest" that Paramount intended to adopt additional risk-taking in its co-financing and territorial sales strategies. (A-2089.)

The evidence at trial further showed that McGrath's effort to mislead Hoffman at Merrill Lynch – so that Hoffman would deliver that same misleading message to potential Melrose investors – worked. On or about May 12, 2004, in response to a request from the Moody's ratings agency (which was evaluating the

23

Melrose notes) for additional information about co-financing, Hoffman copied Moody's *in haec verba* from the e-mail sent to him by McGrath, in which McGrath also stated (with respect to its co-financing plans) that "we are not done making deals yet and these figures will change." (A-2453; A-2088.)

On or about May 13, 2004, Moody's requested more information on the composition of the co-financing in the HDS, and on that date Paramount provided Moody's with such a breakdown. (A-2459-65; A-2587-93.) Moody's explained that it wanted this information to be able to determine "whether the data we have [*i.e.*, the HDS information] properly reflects the risk/reward structure for the future movies" (*i.e.*, the Melrose Slate). (A-2466.) Moody's additionally asked to see how closely the projected Melrose Slate resembled the risk profile of the HDS. (*Id.*) In response, Hoffman consulted with Paramount and then replied to Moody's:

> Forward slate info contains info on those films that will be co-produced with other studios. *I would look at historical data to determine what amounts have been co-financed by other means historically and project that amount going forward.* For conservatism, you could assume slightly lower amounts since the German $ and other structured deals are generally entered into on an opportunistic basis.

(A-2594.)

It is undisputed that the first sentence of Hoffman's message refers to co-productions with other studios, *i.e.*, shared pot deals. It is also undisputed that the term "forward slate info" refers to certain status reports known as "Release Slate

24

Elements," created prior to Appellants' investments and appearing to show that territorial sale levels of the Melrose Slate at the time were running below HDS levels. (A-2594; A-3687-91.)

In other words, Hoffman was saying in the first sentence (based upon information from Paramount) that the Release Slate Elements reports are reliable with respect to shared pot deals. The second sentence of Hoffman's message, however, refers to "co-financ[ing] by other means," including territorial sales. Hoffman was saying in the second sentence (based upon information from Paramount) that the Release Slate Elements reports do *not* accurately reflect territorial sales, and that such co-financing should be projected by Moody's instead as being in line with HDS levels: *i.e.*, about 24.1% of the gross production costs of the films in the Melrose Slate. (The Release Slate Elements reports are discussed further on pages 32-33, *infra*.)

E.     **The Melrose PPM Is Materially False And Misleading**

Paramount issued the Melrose PPM on or about July 22, 2004. (A-3265.) The PPM includes at least four material misstatements and omissions of fact regarding Paramount's territorial sales strategy for the Melrose Slate.

First, the PPM states:

> Paramount aims to achieve consistent slate profitability by managing
> capital commitments for each film project, opportunistically entering
> into output agreements and territory sales with third parties and
> emphasizing cost mitigation programs.

(A-3300.)

The trial court found this statement to be non-actionable because "[t]here is nothing specific beyond it being opportunistic. There is no guarantee that certain things are going to happen. They're going to happen more than on a sporadic basis or even at all. 'Opportunistic' means an opportunity definitionally has to arise which one takes advantage of. And also the fact of foreign presales is only one among several different potentials." (SPA-7, Tr.1611:14-23.)

The trial court never would have found this statement to be false or misleading because, as discussed above, the trial court found no change in the level of territorial sales and accepted the conclusory testimony of Paramount's witnesses that Paramount did at least try to enter into territorial sales of films in the Melrose Slate. The trial court accepted that it was simply bad luck that Paramount was unable to enter into a single territorial sale after the PPM was issued.

Nevertheless, it was uncontroverted that Paramount could not produce a single document evidencing even one attempt by Paramount to territorially sell any films in the Melrose Slate after the PPM was issued. This absence of documentation is striking when compared with the documentation that *did* exist of Paramount's decision by March 2004 to abandon territorial sales in the Melrose Slate. (A-645, Tr.1403:12-17; A-1624-25; A-985, Tr.159:15-160:13, 160:21-161:24; A-3915.)

26

Had the trial court not ignored the documentation, then this statement in the PPM would have to be viewed as false and misleading because under no interpretation could Paramount be understood to have "opportunistically" tried or "aim[ed]" to territorially sell anything. Moreover, Paramount gave no indication in the PPM of its true intention to discontinue territorial sales of films in the Melrose Slate.

Second, the PPM states:

There can be no assurance that Paramount will implement the same co-financing techniques as it has in the past.

(A-3300.) The trial court found that this statement "clearly states there is no assurance to implement those same techniques." (SPA-7, Tr.1611:24-1612:7.)

This statement is another example of Paramount trying to throw investors off-track: by indicating that, regardless of its intentions, unknown factors *could* render Paramount unable to implement certain techniques; when, in fact, Paramount had already decided *with certainty* not to implement territorial sales of the Melrose Slate as Paramount had done with films in the past. (A-3915; A-1624-25.)

Paramount easily could have warned investors in the PPM that Paramount would not employ certain co-financing techniques for the Melrose Slate as Paramount had done in the past – and, in fact, had already decided not to do so –

but Paramount chose instead to say there "can be no assurance" about what the future may hold. Paramount had a duty to be more forthright.

Indeed, on page 36 of the PPM, Paramount referred to press reports about the March 2004 Viacom board meeting, suggesting that Paramount would pursue a more aggressive approach to the "development and production" of films. (A-3305.) Yet, Paramount failed to address the change in foreign rights strategy that had emanated from that *same meeting*. (Pages 11-13, 21-22, *supra*.) Paramount thus pretended to appear candid and providing current information from the same source while it withheld related and important information.

Third, the PPM states:

> Paramount will control all decisions (business, creative or otherwise) relating to *development and production* of each picture *and* whether to pursue and consummate any *co-financing transaction*…. Moreover, Paramount has the right to change its business strategy with respect to the *development and production* of motion pictures.

(A-3305 (emphases supplied).) The trial court did not analyze this statement in its Decision.

This language further evidences Paramount's intent to lull and mislead investors. First, Paramount specifically distinguished between the "development and production" of motion pictures, on the one hand, and "co-financing transactions" relating to motion pictures, on the other hand. Paramount then reserved the right to "change its business strategy" only "with respect to the

28

development and production of motion pictures." This language in the PPM corresponds precisely to McGrath's March 2004 explanation to Paramount's placement agent, Merrill Lynch, that Paramount was considering a more aggressive strategy only with respect to its development of bigger budget films, but not "as it relates to risk management and deal making." (A-2088.)

Paramount wanted and intended this language in the PPM to misdirect investors into believing and accepting, wrongly, that Paramount's co-financing strategy and techniques for the Melrose Slate would not be markedly different from Paramount's historical practices as reflected in the HDS.

Fourth, the PPM states:

> Paramount selectively pursues and enters into co-production agreements, studio "shared pot" deals, split rights deals and similar arrangements under which, depending on the situation, either Paramount enters into an arrangement with a third party pursuant to which the party agrees to share in the cost of production of one of Paramount's films in exchange for obtaining certain distribution rights from Paramount or vice versa.

(A-3308.)

While accepting that this is a present-tense statement, the trial court found that "'selective' is not a word of commitment, of quantity. Shared pot deals are various kinds of forms of diversification. There were five split rights in the Melrose Slate." (SPA-7, Tr.1612:19-1613:3.) Again, the trial court confused concepts and made clearly erroneous findings as a result.

29

The trial court's focus on the word "selectively" missed the point. As discussed above, Paramount concealed from its investors the fact that it did not presently intend to "pursue" or "enter" into *any* further territorial sales after the PPM was issued (and Paramount did not actually do so), "selectively" or otherwise. (Pages 10-15, *supra*.)

Furthermore, as discussed above, shared pot deals are not the same as territorial sales. (Pages 9-10, 18, *supra*.) Thus, while this statement in the PPM may have accurately indicated Paramount's ongoing intention at the time of the PPM's issuance to pursue and enter into shared pot deals, the statement's further indication of Paramount's ongoing indication also to pursue and enter into "split rights deals and similar arrangements" was false and misleading when made.

## F.    Appellants Actually And Justifiably Relied On The PPM And The HDS

It is undisputed that Appellants are all sophisticated investors. Appellants each received the Melrose PPM, the HDS, and a Subscription Agreement. (A-4806-29; A-4852-59; A-4549-4669; A-3422-49; A-4705-4805; A-4166-92; A-315, Tr.479:23-480:4; A-516, Tr.1045:22-1046:5.) The Subscription Agreement makes clear that Appellants were permitted and expected to evaluate the Melrose Transaction according to the PPM and the HDS.

Specifically, the Subscription Agreement provides that each "Investor shall use [] Proprietary Information" provided by Paramount "for the purpose of

evaluating the Securities." (A-3435 §9(b).) "Proprietary Information" is defined in the Subscription Agreement to include the HDS. (A-3434-35 §9(a).) The Subscription Agreement additionally states each investor "has based its decision to purchase the Securities" upon the information in the Subscription Agreement, the PPM and the HDS (as well as other collateral agreements). (A-3435 §4(c).)

Appellants actually evaluated and relied upon the language of the PPM, including relying on Paramount's misrepresentations that it planned to engage in territorial sales. (A-248, Tr.347:11-22; A-490-91, Tr.942:17-944:1; A-598, Tr. 1215:6-1216:3; A-599, 1218:1-1219:8; A-601, Tr.1228:9-1229:2; A517-18, - Tr.1050:24-1051:16.) Appellants also analyzed the data in the HDS through a sophisticated modeling technique known as a "Monte Carlo Simulation," wherein variable film production and performance data is randomized using thousands of computer iterations to derive a bell curve of probable outcomes. (A-409, Tr.730:2-731:20; A-1292, Tr.27:8-20; A-451-52, Tr.898:2-900:7; A-246, Tr.338:2-341:19; A-491, Tr.945:3-946:10; A-495, Tr.962:3-16; A-597, Tr.1211:12-1212:7; A-4219-32; A-3450-63; A-3251-59; A-3370-82; A-2754-57; A-2763-65.)

The Monte Carlo Simulation allowed Appellants to vary data that might reasonably be expected to change, such as box office revenues. None of Appellants varied territorial sales data from the HDS because (a) Paramount had represented that it intended territorial sales for the Melrose Slate to be generally in

31

line with the data in the HDS (A-274, Tr:451:16-453:6; A-245, Tr.341:13-19); and (b) Paramount controlled its ability to engage in territorial sales. (A-3300; A-3305; A-3308; A-524, 1076:12-1077:17; A-323, Tr.512:18-513:7.) (*See generally*, A-3450-63; A-3251-59; A-3370-82; A-2754-57; A-2763-65.)

Paramount contended during the litigation that it had tried to put Appellants on notice that the Melrose Slate of films would not be subject to nearly the level of territorial sales as films in the HDS by providing Appellants with a report called "Release Slate Elements," which, according to Paramount, provided contemporaneous information to Appellants reflecting no significant territorial sales activities. (A-3233-41; A-4678-86.) This contention by Paramount is false.

First, contrary to Paramount's insistence that it had tried to be forthright and clear about its anticipated large drop in territorial sales for the Melrose Slate, there is not a single document or piece of testimony reflecting any effort by Paramount to state that it intended to reduce its territorial sales drastically as between the HDS and the Melrose Slate.

Second, the "Release Slate Elements" reports all included prominent disclaimers stating that the information reflected was "TENTATIVE," "SUBJECT TO CHANGE" and "LIKELY TO BE ADJUSTED FROM TIME TO TIME." (A-4679.) Indeed, the Release Slate Elements reports addressed only 19 of the 25 films that would ultimately be part of the Melrose Slate (although, at the time of

dissemination, investors had no way of knowing how many more films would be included in the slate), and failed to identify two of the most significant films: *War of the Worlds* and *Mission: Impossible III*. (A-4679-82.)[8]

The Release Slate Elements reports also reiterated that they were incomplete and unreliable by stating that the reported information *"excludes all anticipated co-financing amounts not otherwise specifically included."* (A-4681 (emphasis supplied).) The trial court did not address any of these facts in the Decision.

Nor was the information reported in the Release Slate Elements updated by Paramount. Although Paramount sent multiple reports in June and July 2004, each report was identical and reported information only "as of May 27, 2004." (A-4549; A-4642-45; A-4678-82.)

Thus, the Release Slate Elements reports were not contemporaneous warnings to investors that Paramount intended to abandon its territorial sales activities for the Melrose Slate, nor did Paramount intend those reports to serve such a function. As discussed above, McGrath had told Hoffman at Merrill Lynch that investors should *not* view the Release Slate Elements reports as accurate with respect to territorial sales information. (Pages 23-25, *supra*.)

Paramount's reliance on the Release Slate Elements reports faced a further problem that the trial court did not address in its Decision. The evidence showed

---

[8] Paramount's damages expert asserted that there could have been as many as 37 films in the Melrose Slate.

that Paramount did not send Appellant Marathon the same Release Slate Elements reports that Paramount sent to other investors, including Appellants NewStar and Munich Re. (A-4678-86; A-5157-65; A-2754-57; A-600, Tr.1224:15-1225:16.)

Instead, Paramount sent Marathon a separate document purporting to contain similar information but that included only dashes in the "territorial sales" line where other investors received reported figures. (A-2754-57; A-601, Tr.1228:1-8.) This was done because Marathon had requested other information from Paramount to identify the territorial sales breakdown in the HDS more precisely, and Paramount did not want to enable Marathon to compare that specific information with the specific "territorial sales" line item in the Release Slate Elements reports for the Melrose Slate. (A-2735-44; A-598, Tr.1214:18-1217:22.) Paramount falsely represented to Marathon that the territorial sales data for the Melrose Slate was "confidential" at the time to Paramount, even though Paramount disclosed that same information to other investors, including NewStar and Munich Re. (A-2762; A-4678-86; A-5157-65; A-2754-57.)

In addition to seeking more information about territorial sales in the HDS and incorporating those same general co-financing levels into its Monte Carlo Simulations for the Melrose Slate, Marathon also retained a film industry expert from the consulting firm Houlihan Lokey to generally advise Marathon about the Melrose transaction. (A-2713-14; A-540, Tr.1139:9-1140:5.)

34

Munich Re similarly retained a film industry expert, Harris Maslansky, to reverse-engineer the data in the HDS to determine if it raised any red flags, and, finding no cause for alarm, Munich Re similarly accepted the general co-financing levels from the HDS in its Monte Carlo Simulations. (A-274, Tr:451:16-453:6; A-519, Tr.1056:15-24; A-520, Tr.1061:12-1062:5.)

NewStar consulted with the Moody's ratings agency, which was evaluating the Melrose deal, and received a second opinion from Moody's confirming that it was analyzing the Melrose transaction in the same way that NewStar was doing, including accepting the general co-financing levels from the HDS in its Monte Carlo Simulations. (A-3370-82; A-496, Tr.965:5-966:24.)

## G.    There Are No Waivers Or Disclaimers That Bar Appellants' Claims

Paragraph 4(s)(iii) of Appellants' Subscription Agreements disclaims any representations by Paramount that the Melrose Slate of films "will be distributed in any particular manner or that such distribution will be continuous." (A-3432.) Paragraph 4(t) then provides that Appellants "waive and release" Paramount "from liability arising out of the matters described in paragraph 4(s)." (A-3433-34.)

The trial court found the terms "distribute" and "distribution" to encompass Paramount's film co-financing activities, and on that basis found that Appellants could not justifiably rely upon Paramount's representations about its territorial

sales strategy for the Melrose Slate.  (SPA-5, Tr.1603:17-1604:10.)  This was further error that should be reversed.

Paragraph 4(s)(vii) makes clear that film "distribution" refers to the manner in which films are marketed and delivered to the public for viewing, not to the financing required to produce films.  (A-3432.)  Paragraph 4(s)(vi) reserves to Paramount the decision of how much to spend to market and distribute.  (*Id.*) Again, there is no reference to film financing.  And Paragraph 4(s)(iii) disclaims any representations by Paramount that its "distribution [of films in the Melrose Slate] will be continuous," which obviously does not refer to film financing.  (*Id.*)

The Melrose PPM likewise expressly distinguishes between film "distribution" and film "financing" as distinct activities.  The PPM explains that, "[t]hrough its film division, Paramount produces, *finances* and *distributes*" motion pictures.  (A-3724 (emphases supplied).)  The operative documents between the parties support only one conclusion:  that "distribution" and "financing" of films are not the same thing.

The trial court's contrary finding was not based on the governing documents or anything else in the record.  It was based instead on the trial court's own, unsupported pronouncement on the meaning of "distribution."  The Decision states:

> I do find that distribution is a term which sometimes encompasses financing and sometimes may just be about transferring a picture from here to there.  *But always it's in connection with money.  Distribution of films has never been disconnected from the financial implications*

36

*of money.* Financing can, of course, have a broader definition and may or may not have anything to do with actual distribution. So financing can be one term, and it may at times incorporate distribution, but it may at other times not. Distribution always incorporates money.

(SPA-5, Tr.1603:17-1604:10 (emphasis supplied).) This finding should be reversed.

Similarly, while the trial court acknowledged well established law that general, as opposed to specific, disclaimers of liability may not exculpate a party from its fraud, the trial court nonetheless relied on general disclaimers in the Subscription Agreement to do just that.

Specifically, the trial court relied on paragraph 9(f) of the Subscription Agreement, which states only generally that Paramount does not "make[] any express or implied representation or warranty as to the accuracy or completeness of any Proprietary Information." (A-3436 §9(f).) The trial court also relied on paragraph 16 of the Subscription Agreement, which includes a litany of general disclaimers. (A-3437 §16.) None of those provisions specifically disclaims Paramount's liability for fraud arising out of its territorial sales activities.

The trial court further relied on "[t]he first page of the PPM [which] states it should not be a basis for any investment decision, and none of Merrill Lynch or Paramount have any obligations for forward-looking statements, and that there is no standing or recourse against Paramount." (SPA-5-6, Tr.1605:25-1606:6.) The trial court found: "that is a statement which has real meaning and does indicate

37

that the plaintiffs here should not have had standing or recourse against Paramount." (*Id.*) Nevertheless, Paramount's unilateral disclaimer of fraud in a transaction sponsored by and attributed to it is ineffective. Judge Griesa ruled twice that Appellants' claims are not barred by the *Janus* doctrine, and Judge Forrest declined in the Decision to disturb Judge Griesa's ruling. (A-11-12; A-19.)

The trial court also made no effort to reconcile the language in paragraph 4(c) of the Subscription Agreement discussed above, which states that: "The Investor *has based* its decision to purchase the Securities" upon, *inter alia*, the PPM. (A-3428-29 (emphasis supplied).)

Thus, the trial court made new law that sophisticated investors cannot rely on a private placement memorandum as "a basis for any investment decision." What "sophisticated investors" like Appellants must do in the face of general disclaimers in the future, according to the Decision, is "get a rep[resentation]" or warranty about every specific thing they care about, regardless of any representations made in a private placement or offering memorandum about those matters. (SPA-13, Tr.1635:22-23.) That is not, and should not be, the law.

## SUMMARY OF ARGUMENT

Appellants demonstrated that in the five-year period prior to their investment, Paramount territorially sold 24.1% of the aggregate production cost of its films. Appellants also demonstrated that only 3.2% of the aggregate production

cost of films in Melrose Slate had been offset by territorial sales: a drop of over 85%.   Appellants also showed that Paramount consciously misrepresented its intention to continue "business as usual" while having secretly abandoned its use of territorial sales.

Nonetheless, after a bench trial, the trial court awarded judgment to Paramount finding that Appellants' claims did not "make a lot of sense" to her "from a business perspective" and that the levels of territorial sales in the Melrose Slate were not materially different from the territorial sales levels in the HDS. These findings infect the Decision throughout, are clearly erroneous and should be reversed.

## STANDARD OF REVIEW

On appeal from a Rule 52(c) judgment on partial findings, the district court's findings of fact are reviewed for clear error and its conclusions of law are reviewed *de novo*.  *Austrian Airlines Oesterreichishe Luftverkehrs AG v. UT Fin. Corp.*, 336 F. App'x 39, 40 (2d Cir. 2009).  Mixed questions of fact and law are reviewed *de novo*.  *E.g.*, *Travellers Int'l, A.G. v. Trans World Airlines*, 41 F.3d 1570, 1575 (2d Cir. 1994).

# ARGUMENT

## I. THE TRIAL COURT ERRED IN FINDING THAT A WAIVER AND DISCLAIMERS BARRED APPELLANTS' CLAIMS

### A. Appellants Did Not Waive Their Claims

The trial court erred by relying on its own belief that the term "distribution," as used in the waiver provisions of Paragraphs 4(s) and 4(t) of the Subscription Agreement, must be taken to mean "financing," instead of analyzing, according to applicable contract interpretation principles, how those terms are actually used in the Subscription Agreement and the PPM. The Decision's finding that Appellants' waived their claims under Paragraph 4(t) should be reversed.

As discussed above, the Subscription Agreement and the PPM both use the terms "distribution" and "financing," but *not* interchangeably. (Pages 35-37, *supra*.) "Distribution" is specifically and repeatedly used to describe the dissemination of films, not the financing of films. (*Id.*) Paragraph 4(s) of the Subscription Agreement specifically equates "distribution" with the "release pattern" of films. (*Id.*) The PPM expressly states that "Paramount produces, finances *and* distributes" motion pictures. (*Id.*)

Such distinct uses should have been credited by the trial court as a matter of law. *E.g.*, *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("An interpretation of a contract that has the effect of rendering

at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.") (citations omitted).[9]

Instead of conducting this requisite analysis, the trial court decided – on the basis of no evidence – that "[d]istribution always incorporates money," that "[d]istribution of films has never been disconnected from the financial implications of money," and that "always it's in connection with money." (Pages 36-37, *supra*.) Not only is that finding objectively incorrect and unsupported, but it contradicts the manner in which the terms "distribution" and "financing" are actually used in the documents.

This Court recently encountered a similar situation, in *Sleepy's LLC v. Select Comfort Wholesale Corp.*, No. 12-4437-cv, 2015 U.S. App. LEXIS 3034 (2d Cir. Feb. 27, 2015), and reversed a Rule 52(c) judgment because of a similar lower court error. In *Sleepy's*, the trial court found that a dealer agreement had "expired" by its own terms and, relying on another provision concerning the "termination" of the agreement, could not be extended except in certain ways related to the "termination" of the agreement. *Id.* at *10-11. Thus, the trial court "treated 'expiration' and 'termination' as interchangeable terms referring to the end of the contract term, regardless of how it occurred." *Id.* at *11.

_____
[9] The Subscription Agreement is interpreted according to New York law. (A-3437.)

This Court reversed, finding that the trial court's "construction of the contract was erroneous" because it failed to account for the manner in which the agreement "does indeed use those terms to refer to different ways of ending the contract term." *Id.* at *11.

The trial court in this case committed the same error, and reversal is similarly warranted.

### B.    Paramount Did Not Disclaim Its Liability For Fraud

The trial court also erred by looking to a series of general disclaimers in the Subscription Agreement, PPM and associated agreements to find that Appellants' claims for fraud were barred.  (SPA-6, Tr.1606:3-6.)

The law is well established that a party cannot immunize itself from liability for fraud through general disclaimers.  *E.g.*, *Turkish v. Kasenetz*, 27 F.3d 23, 27-28 (2d Cir. 1994); *Kalisch-Jarcho, Inc. v. New York*, 58 N.Y.2d 377, 384-85 (1983).

Paramount engaged in fraud.  Paramount repeatedly represented in the Melrose PPM that it would "pursue" territorial sales of films in the Melrose Slate, "opportunistically" and "selectively."  (A-3300, A-3308.)  Paramount invited Appellants to rely on the HDS in "evaluating the Securities" and informing the meaning of the PPM.  (A-3567 §9(b).)  Paramount had its executives falsely reaffirm to investors that the co-financing strategy for the Melrose Slate would not be "fundamentally change[d]" from the strategy reflected in the HDS, and that

42

territorial sales would continue "in much the same manner as we always have" and in accord with "the historical levels." (A-2088.) And Paramount concealed its true intention not to pursue (opportunistically, selectively, or otherwise) a single territorial sale after issuance of the PPM, and to reduce territorial sales by 85% relative to the HDS (which caused over $18 million in additional losses to Appellants than they otherwise would have suffered). (A-3819; A-3845-68.) That is fraud.

There are no specific disclaimers that apply to Paramount's co-financing strategy. Most notably, Paramount specifically reserved "the right to change its business strategy *with respect to the development and production* of motion pictures." (A-3305.) Paramount did not reserve the same right with respect to "co-financing transactions," which are distinguished from "the development and production" of motion pictures and are separately addressed in the PPM. (A-3274-75; A-3277; A-3279-81; A-3305.) *See, e.g.*, *VKK Corp. v. NFL*, 244 F.3d 114, 130 (2d Cir. 2001) (applying doctrine of *expressio unius est exclusio alterius*).

The trial court's reliance on language that Paramount reserved the right "whether to pursue or consummate any co-financing transaction" on a film-by-film basis is misplaced. (A-3305.) That language does not reserve the right to change Paramount's co-financing "strategy," as Paramount did with respect to its

43

"development and production" of films.  Paramount knew how to say the word "strategy" when it wanted.  *See Sleepy's*, 2015 U.S. App. LEXIS 3034, at *11.

The trial court's reliance on language within the first page of the PPM that the PPM should not be "the basis for any investment decision" is also misplaced. (A-3265.)  For one thing, that is, at most, a general disclaimer that cannot absolve Paramount of liability for fraud as a matter of law.  Moreover, the trial court overlooked that this language (for whatever it may be worth) is specifically vitiated by Paragraph 4(c) of the Subscription Agreement.  (A-3560-31.)  *See, e.g.*, *Capital Ventures Int'l v. Republic of Arg.*, 652 F.3d 266, 271 (2d Cir. 2011) (explaining that New York follows rule that "a specific provision . . . governs the circumstance to which it is directed, even in the face of a more general provision").

The other "general disclaimers" relied upon by the trial court in its Decision are equally ineffective.  (SPA-5-6, Tr.1604:12-1608:17.)

Likewise, the trial court erred in finding that Appellants' only means of bringing suit would have been to "get a rep" guaranteeing a specific level of territorial sales because of their "sophistication."  (SPA-13, Tr.1635:22-23.) "Sophisticated investors are entitled to the protection of section 10(b) of the Securities Exchange Act" like anyone else.  *Quintel Corp., N.V. v. Citibank, N.A.*, 596 F. Supp. 797, 802 (S.D.N.Y. 1984) (string citation omitted); *accord United States v. Schlisser*, 168 F. App'x 483, 486 (2d Cir. 2006).  There is no law that says

sophisticated investors may not rely on the language of offering materials and must seek extrinsic assurances in excess of what offering materials represent. *See, e.g.*, *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993) (referring to an investment prospectus as "the single most important document and perhaps the primary resource an investor should consult").

## II.  THE TRIAL COURT ERRED IN FAILING TO FIND FALSITY

As discussed in detail above, the trial court clearly erred in finding that Paramount's territorial sales strategy and practices for the Melrose Slate did not materially deviate from Paramount's "business as usual" as reflected in the HDS. (Pages 2-5, 15-21, *supra*.)  The trial court's findings cannot be squared with the evidence and should be reversed.

## III.  THE TRIAL COURT ERRED IN FAILING TO FIND MATERIALITY

The trial court similarly erred in finding that territorial sales would not have been "material" to Melrose's investors.  (SPA-13-14, Tr.1634:14-1638:25.)  *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1998) (information is material "'if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to invest'") (citation omitted).[10]

---

[10] In part, the trial court mistakenly relied on the subjective standard of "actual reliance" in finding no objective "materiality."  (A-739-40, Tr.1635:19-1638:18.)  As explained in section VI.B., *infra*, the trial court's finding of no actual reliance was also erroneous.

Judge Griesa had observed the materiality of Paramount's changed territorial sales strategy early in this case, calling the change "something that would inevitably be important to such an investor."  (A-97, Tr.33:5-12.)  Judge Griesa's observation was correct.

In finding no materiality, Judge Forrest confused forms of risk mitigation and found that Appellants should not be heard to complain about territorial sales in particular because Paramount engaged in other kinds of risk mitigation, including: (i) "continu[ing] to make and market movies … according to its best business judgment at the time" and continuing to try to make "good film[s] … with solid stars who are known to the box office to be a good draw," which the trial court described as "a form of risk mitigation" (SPA-8, Tr. 1617:15-19, Tr.1616:2-6); (ii) continuing to enter into shared pot deals, which the trial court described as "various kinds of forms of diversification" and risk mitigation even though the evidence is uncontroverted that shared pot deals and territorial sales are not fungible (SPA-7, Tr.1612:25-1613:1; A-641, Tr.1386:4-1388:8; A-243, Tr.326:17-327:8; A-164, Tr.152:6-25); and (iii) forming Melrose LLC, which "was itself a form of risk mitigation" (although not benefiting investors) (A-735, 1618:4-5). These findings failed to address the real issue in the case.

The objective materiality of Paramount's territorial sales strategy is evident by the PPM's repeated discussions of its territorial sales strategy and practices. (A-3275; A-3280-81; A-3300; A-3308.)

Materiality is also evidenced by Paramount's specific focus on "Retaining More Foreign Rights" in its March 2004 Viacom board meeting, and by Paramount's efforts to mislead investors after the *Wall Street Journal* article discussing that meeting into thinking that "[t]he intention [of Paramount] is to continue to enter into … territorial sales … in much the same manner as we always have." (A-2088.)

Materiality is further evidenced by Moody's questioning about territorial sales of the Melrose Slate in deciding how to rate the Melrose bonds. (A-2459-65; A-2587-93; A-2466.)

And, of course, materiality is demonstrated by the fact that knowledgeable investors like Appellants all considered territorial sales to be important. (A-248, Tr.347:11-22; A-490-91, Tr.942:17-944:1; A-598, Tr.1215:6-1216:3; A-599, 1218:1-1219:8; A-601, Tr.1228:9-1229:2; A517-18, Tr.1050:24-1051:16.)

The trial court's finding of no materiality should be reversed.

## IV. THE TRIAL COURT ERRED IN FAILING TO FIND ACTIONABLE MISREPRESENTATIONS AND OMISSIONS IN THE PPM

Because the trial court confused and conflated certain other forms of what the court found to be "risk mitigation" with territorial sales, and because the trial

court also overlooked the parties' stipulation and further erroneously distinguished between territorial sales and split rights deals, the trial court found that the Melrose PPM included no actionable misrepresentations or omissions because, according to the trial court, Paramount conducted "business as usual" with the Melrose Slate. (SPA-8, Tr.1617:16-23.) This finding is infected by the trial court's misapprehension of the facts and should be reversed.

A statement is actionable under Section 10(b) when it is literally false or a "half-truth[]," meaning "literally true statements that create a materially misleading impression." *SEC v. Syron*, 934 F. Supp. 2d 609, 627, 629 (S.D.N.Y. 2013) (citations omitted) (finding that prefatory paragraph in financial statements "establishe[d] the baseline against which to judge the accuracy of the company's disclosures"); *see also McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.").

An actionable omission exists when a reasonable investor could "scour the relevant prospectuses" and not be able to understand "the real nature of the arrangement" that is being concealed. *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 48 (S.D.N.Y. 2013); *accord Fogarazzo v. Lehman Bros.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 298

48

(S.D.N.Y. 2003); *see also In re Parmalat Sec. Litig.*, Nos. 04 Civ. 0030, 04 MD 1653 (LAK), 2008 U.S. Dist. LEXIS 64296, at *32 (S.D.N.Y. Aug. 20, 2008).

As explained above, the PPM's representations about Paramount's "opportunistic" and "selective" pursuit of territorial sales are literally false because Paramount failed to show that it pursued *any* territorial sales after the PPM was issued. (Pages 13-15, 25-27, 29-30, *supra*.) There was no "business as usual" by Paramount after the PPM.

Alternatively, to the extent Paramount relies on the four deals it executed prior to the PPM's issuance, constituting only 3.2% of the aggregate Melrose Slate production cost, the PPM's representations are actionable "half-truths." When compared to the HDS data showing an 85% higher level of territorial sales, it is unreasonable to conclude that such a drop is a continuation of "business as usual." *Cf. In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

The PPM additionally includes actionable omissions. A reasonable investor could scour the PPM and the HDS and remain unaware that Paramount had privately decided, months earlier, to abandon its historical and "usual" territorial sales in connection with the Melrose Slate. (Pages 10-15, *supra*.) The March 18,

2004 e-mail from Tom McGrath to Paramount's placement agent, Merrill Lynch, shows that Paramount tried to ensure misapprehension of the PPM by potential Melrose investors. (Pages 21-24, *supra*.)

Accordingly, the trial court's findings that there are no actionable misrepresentations or omissions in the Melrose PPM should be reversed.

## V.  THE TRIAL COURT ERRED IN FAILING TO FIND SCIENTER

Plaintiffs may show scienter through "evidence of conscious misbehavior or recklessness." *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012); *Herman & Maclean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983). The element may be established (i) "when it is clear that a scheme, viewed broadly, is necessarily going to injure" or where actions "can be foreseen to result in harm," *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 220-221 (2d Cir. 2000); or (ii) by conduct that was "highly unreasonable, representing an extreme departure from the standards of ordinary care." *Gould*, 692 F.3d at 158.

The trial court committed clear error in failing to recognize Paramount's intent to deceive. By reducing territorial sales, Paramount preserved the possibility of gaining more "upside" on the bigger budget movies that Paramount planned to make. (A-151, Tr.98:25-99:10; A-412, Tr.740:17-741:9; A-177, Tr.201:10-202:17; A-641, Tr.1386:13-21; A-1308, Tr.90:20-91:21.) By having the Melrose investors in place, however, Paramount mitigated its *own* potential downside. The trial court

observed as much when it found that Melrose LLC "was itself a form of risk mitigation" – but only *for Paramount*.  (SPA-9, Tr.1618:4-5.)  This same reality is reflected in Badagliacca's April 2004 'zero-sum game' report, and in Paramount's PowerPoint presentation:  the "Impact Of Financing" from Melrose was that Paramount would "Retain More Foreign Rights."  (A-2125-32; A-3915.)

Had Paramount been forthright about its plan to reduce territorial sales, it ran the risk of scaring away potential Melrose investors (like Appellants) who were investing in material part because of Paramount's well-known conservatism.  (*E.g.*, A-240-41, Tr.316:11-318:4.)  This is precisely why Merrill Lynch sought urgent clarification from Paramount after a purported "new mantra" of risk-taking was reported by the *Wall Street Journal* in March 2004, and why McGrath misled Merrill Lynch into reporting back to investors that Paramount's "new mantra" pertained only to film development and production, *not* to Paramount's co-financing strategies.  (Pages 21-25, *supra*.)

The trial court inexplicably credited the testimony of Paramount's witnesses who had created the PowerPoint but professed, to a person, not to recall or understand what the words in the PowerPoint meant.  (A-1091-92, Tr.63:7-67:10; A-1050, Tr.92:17-93:14; A-881-82, Tr.108:13-109:13; A-1074, Tr.79:2-80:15; A-1008, Tr.75:12-16.)

Because the trial court credited such practiced ignorance by Paramount's witnesses, it found that the PowerPoint could not be taken to mean what it says, and thus could not be considered evidence of scienter. (A-738, 1632:5-14.) That finding was clearly erroneous. *See*, *e.g.*, *Presley v. U.S. Postal Serv.*, 317 F.3d 167, 176-77 (2nd Cir. 2003) (Sotomayor, J.) (vacating findings of fact because trial court had clear misimpression of the evidence).

The trial court committed further error in not allowing Paramount's Rule 30(b)(6) witness in discovery, Karen Magid, Esq., to be cross-examined at trial as a corporate representative, and requiring Appellants to ask questions of Ms. Magid only in her personal capacity. (A-595, Tr.1203:13-18.) *See Sciarretta v. Lincoln Nat'l Life Ins. Co.*, No. 13-12559, 2015 U.S. App. LEXIS 2864, at *11-13 (11th Cir. Feb. 26, 2015); *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006); *Union Pump Co. v. Centrifugal Tech., Inc.*, 404 F. App'x 899, 907-08 (5th Cir. 2010); *Sara Lee Corp. v. Kraft Foods, Inc.*, 276 F.R.D. 500, 503 (N.D. Ill. 2011).

Because of the trial court's erroneous handling of Ms. Magid's testimony, Ms. Magid was permitted to profess ignorance as an "individual" (which she did to an astonishing degree), and "Paramount" was not required to be cross-examined during the trial.

The evidence of Paramount's conscious misbehavior (or at least recklessness with the truth) was equally clear from Paramount's documents. Again, McGrath's March 18, 2004 e-mail to Merrill Lynch about the *Wall Street Journal* article is compelling. (Pages 21-24, *supra*.) Instead of taking the opportunity to be forthcoming, McGrath had and used that opportunity to deceive by assuring Merrill Lynch (with the expectation that this message would be relayed to Melrose's potential investors) that he "was intimately involved in preparing the materials for that meeting and they do not suggest fundamental changes in strategy." (A-2088.) McGrath also purported in his e-mail to quote from the PowerPoint that he had prepared, but he omitted the important language about the "Impact of Financing" from Melrose that preceded the language about Paramount's decision to "Retain More Foreign Rights." (A-2088; A-3915.) McGrath additionally insisted that territorial sales, specifically, would continue for the Melrose Slate "in much the same manner as we always have" (*i.e.*, as reflected in the HDS). (A-2088.)

The trial court's finding that McGrath's e-mail is "so vague and general" and "insufficient standing alone to establish an intent to defraud" is clearly erroneous.

In addition, Paramount deceived Appellants when it manipulated its Release Slate Element reports to create a virtual 'shell game' of information about

territorial sales upon false claims of "confidentiality," so that each Appellant would receive only pieces of information about territorial sales and no Appellant would ever be handed the complete universe of relevant information. (Pages 32-34, *supra*.)

Of course, Paramount's intent to deceive is also apparent from the Melrose PPM, which Paramount was able to craft as it desired, and which is materially false and misleading with respect to the matter of territorial sales. (Pages 25-30, *supra*.)

Because the trial court could not itself imagine a business reason for Paramount to deceive Appellants about its territorial sales strategy, the trial court credited the conclusory testimony by Paramount's witnesses and gave no credit to Paramount's own documents. The trial court's finding of no scienter by Paramount should be reversed.

## VI.   THE TRIAL COURT ERRED IN FAILING TO FIND RELIANCE

### A.   Reliance Should Have Been Presumed By The Trial Court

Because the PPM includes actionable omissions, the trial court should have presumed reliance in this case under the doctrine of *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972). It was erroneous for the trial court not to do so. *See In re Parmalat Sec. Litig.*, 2008 U.S. Dist. LEXIS 64296, at *32; *Fogarazzo*, 232 F.R.D. at 186; *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. at 298.

## B.     The Trial Court Erred In Finding No Actual Reliance

Actual reliance, or transaction causation, is established by showing that a securities purchaser "likely would not" have purchased the securities if it had known about a misrepresentation or omission. *AUSA Life Ins. Co.*, 206 F.3d at 209. The test is subjective and focused on the investing decision of the plaintiff itself. *See, e.g.*, *McMahan & Co. v. Wherehouse Entm't, Inc.*, 859 F. Supp. 743, 753 (S.D.N.Y. 1994) (actual reliance exists where evidence shows that misrepresented element was only "one of the inducements" and only "of some value" in plaintiff's decision-making).

The evidence of Appellants' actual reliance on the PPM's misrepresentations and omissions regarding territorial sales was entirely uncontroverted.  Each Appellant testified that it considered Paramount's pursuit of territorial sales in general accord with the levels reflected in the HDS to be important to its decision-making.  (A-248, Tr.347:11-22; A-490-91, Tr.942:17-944:1; A-598, Tr.1215:6-1216:3; A-599, 1218:1-1219:8; A-601, Tr.1228:9-1229:2; A517-18, Tr.1050:24-1051:16.)  Each Appellant testified that it would not have invested in Melrose had Paramount been truthful in revealing a plan to reduce territorial sales by 85%.  (*Id.*) And each Appellant analyzed the HDS through sophisticated modeling techniques and looked to outside experts to help them understand the data that Paramount had provided.  (A-409, Tr.730:2-731:20; A-1292, Tr.27:8-20; A-451-52, Tr.898:2-

900:7; A-246, Tr.338:2-341:19; A-491, Tr.945:3-946:10; A-495, Tr.962:3-16; A-597, Tr.1211:12-1212:7; A-4219-32; A-3450-63; A-3251-59; A-3370-82; A-2754-57; A-2763-65; A-3450-63; A-3251-59; A-3370-82; A-2754-57; A-2763-65.)

The trial court's finding that none of Appellants actually relied on the existence of territorial sales was predicated on the trial court's belief that Appellants should have "drilled down" more in their Monte Carlo Simulations and varied data about territorial sales more severely, and should have also demanded "representations and warranties" about territorial sales in addition to the PPM. (SPA-13, Tr.1635:19-1636:18.)  These findings miss the point.

Each Appellant testified that they used the Monte Carlo Simulation to vary data that *was* not in the issuer's control, such as box office performance.  (A-274, Tr:451:16-453:6; A-245, Tr.341:13-19; A-3450-63; A-3251-59; A-3370-82; A-2754-57; A-2763-65.)  There was no basis for the trial court to reject Appellants' testimony and evidence that each actually relied on its respective Monte Carlo Simulations that incorporated the territorial sales data reflected in the HDS.  (SPA-15, Tr.1644:8-12; SPA-3, Tr.1595:8-14.)

Nor was there any basis for the trial court to reject Appellants' testimony that each actually relied on the language (and omitted language) about territorial sales in the PPM, simply because Appellants did not seek additional representations and warranties about specific planned territorial sales levels from

Paramount before investing – representations and warranties that would have been unreasonable to demand in this context and which Paramount conceded never would or could have been granted.  (A-697, Tr.1469:19-22.)

### C.    The Trial Court Erred In Finding No Justifiable Reliance

The trial court erroneously based its finding of no justifiable reliance on its erroneous finding that the PPM and related agreements disclaimed away any possible liability related to Paramount's territorial sales practices.  According to the Decision:

> [Y]ou can disclaim your way out of misrepresentation based upon all of the facts and the circumstances in a case, based upon the sophistication of the investor, based upon what work that investor could have done to understand the misrepresentation.  Here the work that [Appellants] needed to have done they never began to do.  They didn't model foreign presales [in their Monte Carlo Simulations]. They didn't dig down into foreign presales…. Now, disclaimers and disclosures make any reliance on the foreign presales and other particular types of risk mitigation strategies unreasonable.

(SPA-15, Tr.1645:6-21.)  The trial court misapprehended the law.

First, as explained in Section I.B., *supra*, Paramount did not specifically disclaim its liability related to territorial sales.

Second, the Decision is not, and cannot be, correct that sophisticated investors may not "reasonably" rely on a PPM's representations, and that sophisticated investors must "drill down" on every investment element that they find important, regardless of what the PPM says about such elements.  *See, e.g.*,

*Brown*, 991 F.2d at 1032 (explaining that only "minimal diligence" into representations is required to show reasonable reliance); *Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d Cir. 1989) (plaintiff must only demonstrate that it was not "reckless" in its due diligence).

There was no basis for the trial court to find that Appellants were reckless and that they failed to exercise the requisite minimal diligence into the PPM's representations about territorial sales. Appellant Marathon made specific requests for more information about territorial sales from Paramount (and received different Release Slate Elements reports than other investors as a result under Paramount's false pretext of "confidentiality"). (A-2735-44; A-598, Tr.1214:18-1217:22; A-2713-14; A-540, Tr.1139:9-1140:5.) Appellant Munich Re hired a film industry expert to reverse-engineer the data in the HDS, including data about territorial sales, to determine if the data seemed unreasonable or raised any red flags (which it did not). (A-274, Tr.451:16-453:6; A-519, Tr.1056:15-24; A-520, Tr.1061:12-1062:5.) And Appellant NewStar consulted with Moody's to confirm its method of analysis and Monte Carlo modeling because Moody's was rating the Melrose bonds and had access to more information from Paramount than typical investors (although it was unknown at the time that Paramount had affirmatively misrepresented to Moody's (through Merrill Lynch) that Moody's should "look at historical data [*i.e.*, in the HDS] to determine what amounts have been co-financed

58

by other means [*i.e.*, other than shared pot deals, including territorial sales] *and project that amount going forward*"). (A-3370-82; A-496, Tr.965:5-966:24; A-2594 (emphasis supplied).)

Regardless of the PPM's and associated agreements' general disclaimers, Appellants reasonably relied on the PPM's misrepresentations about territorial sales as a matter of fact and law. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. at 72.

## VII. THE TRIAL COURT ERRED IN FAILING TO FIND LOSS CAUSATION

A plaintiff satisfies the loss causation element of its securities fraud claim if it can show a causal connection between the defendant's alleged misconduct and the economic harm ultimately suffered by the plaintiff. *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186-87 (2d Cir. 2001).

Critically, "proving loss causation in connection with the sale of privately-offered, asset-backed securities … is a different undertaking from proving loss causation in a typical stock drop case." *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 403 (S.D.N.Y. 2009), *aff'd*, 386 F. App'x 5, 8 (2d Cir. 2010). Where there is no efficient, public market for securities, a

regression analysis of whether another isolated event may have affected the value of securities is not required to correct for extraneous market conditions. *Id.*; *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 473 (S.D.N.Y. 2012) ("[A] plaintiff may demonstrate loss causation [in a rated notes context] by showing a causal link between the fraud and a decrease in the amount of money returned to plaintiffs over the course of the securitization."); *accord United States v. Martoma*, 993 F. Supp. 2d 452, 457-58 (S.D.N.Y. 2014); *Pure Earth, Inc. v. Call*, 531 F. App'x 256, 260-61 (3d Cir. 2013).

Appellants proved loss causation through the report of their damages expert, which was admitted for that purpose. (A-3815; A-691, Tr.1444:5-25.) That report – which Paramount did not move to exclude on *Daubert* grounds – reliably linked Appellants' damages to Paramount's abandonment of territorial sales and was not disputed by any contrary report offered by Paramount. (A-3867-68.)

The trial court did not take any account of the relevant law cited above in the Decision and relied instead on inapt law dealing with publicly-traded stocks, and on that basis found no evidence of loss causation because Appellants did not produce a regression analysis or otherwise rule out other potential "macro-economic factors" for their losses. (A-743, Tr1651:13-24 (citations omitted).) The Decision is erroneous and should be reversed.

## VIII. THE TRIAL COURT ERRED IN AWARDING JUDGMENT TO PARAMOUNT ON APPELLANTS' COMMON LAW FRAUD, FRAUDULENT CONCEALMENT AND UNJUST ENRICHMENT CLAIMS

### A. The Trial Court's "Fraud" Ruling Should Be Reversed

Under New York law, "[f]raud requires the following elements: (1) representation of material fact; (2) falsity; (3) scienter; (4) reasonable reliance; and (5) injury." *Koch v. Greenberg*, 14 F. Supp. 3d 247, 256 (S.D.N.Y. 2014). Unlike Section 10(b) claims, material misrepresentations that are not "'made to the plaintiff directly'" can be actionable under New York law, "so long as [the] plaintiff is among the 'class of persons' intended to rely on the statement" and the defendant "was a driving force behind" the statement being made. *Id.* at 257, 258 (citations omitted).

In addition to the actionable misrepresentations in the PPM discussed above, Paramount's misrepresentation to Moody's (through Merrill) that historical co-financing data from the HDS should be projected for the Melrose Slate is actionable under New York law. (Pages 23-25, *supra*.) *See Koch*, 14 F. Supp. 3d at 257-58 ("[E]ven if Greenberg's statements were made to Zachys or its owner, rather than to Koch himself, so long as Greenberg reasonably expected auction attendees to rely on those statements . . . they may be actionable representations under New York law.").

61

In addition, contrary to the trial court's finding, Appellants' sophistication should not have been a bar to relief.  *See also*, *Koch*, 14 F. Supp. 3d at 259-260 ("[I]t was reasonable for the jury to conclude that, in light of all the circumstances, and despite [plaintiff's] sophistication and his right to inspect the bottles [of fake wine], it was unreasonably difficult or impossible for him to have discovered 'what [defendant] knew.'") (citation omitted); *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 407, 410-11 (S.D.N.Y. 2004) ("[E]ven had the Banks exercised their right to inspect GC's books, there is no evidence on the present record that they necessarily had the means to discover the fraud….  The mere existence of the right to inquire, without more, is not dispositive.") (citations omitted).

The Decision states:

> And also in New York, you're also to look at sophisticated businessmen and determine whether or not they could have been defrauded in the manner suggested and *it's just not credible to the Court that they could have been.  Not these guys*.

(SPA-17, Tr.1653:5-9 (emphasis supplied).)

The trial court erred in finding that Appellants were essentially 'too sophisticated' to be deceived as a matter of law.

## B.    The Trial Court's "Fraudulent Concealment" Ruling Should Be Reversed

The trial court misstated the law in finding that "[o]missions do not exist really in New York State fraud claims."  (SPA-17, Tr.1653:1-2.)  "[U]nder New

York law, silence or omission with respect to a material fact can serve as the equivalent of an affirmative misrepresentation where either: (1) 'one party possesses superior knowledge, not readily available to the other,' or (2) 'the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth.'" *Koch*, 14 F. Supp. 3d at 258 (citation omitted); *accord JP Morgan Chase Bank*, 350 F. Supp. 2d at 410.

The evidence was clear and convincing that Paramount possessed superior knowledge (relative to Appellants) about its undisclosed plan to abandon territorial sales in connection with the Melrose Slate. (Pages 10-15, *supra*.) The trial court's award of judgment to Paramount on Appellants' fraudulent concealment claim should be reversed.

### C. The Trial Court's "Unjust Enrichment" Ruling Should Be Reversed

To state a claim for unjust enrichment under New York law, "a plaintiff must establish 1) that the defendant benefited 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution." *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 478 F. App'x 679, 683 (2d Cir. 2012) (citation omitted).

For all the reasons discussed above, the evidence demonstrated that Paramount unjustly enriched itself at Appellants' expense. The trial court erred in

finding that Paramount acted in "equity" and "good conscience." (SPA-17-18, Tr.1653:24-1654:12.)

## **CONCLUSION**

For the foregoing reasons, Appellants respectfully request that this Court reverse in its entirety the Decision below awarding Paramount judgment on all of Appellants' claims pursuant to Fed. R. Civ. P. 52(c).

Dated: New York, New York
        March 16, 2015                     PRYOR CASHMAN LLP


                              By:   ___*/s/ James A. Janowitz*___
                                    James A. Janowitz
                                    William L. Charron
                                    Bryan T. Mohler
                                    Benjamin S. Akley
                              7 Times Square
                              New York, New York 10036-6569
                              (212) 421-4100
                              *Attorneys for Plaintiffs-Appellants*
                              *Marathon Structured Finance Fund, LP,*
                              *NewStar Financial, Inc., and Munich Re*
                              *Capital Markets New York, Inc.*

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,978 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Dated: New York, New York
      March 16, 2015         PRYOR CASHMAN LLP


By:    */s/ James A. Janowitz*
    James A. Janowitz
    William L. Charron
    Bryan T. Mohler
    Benjamin S. Akley
7 Times Square
New York, New York 10036-6569
(212) 421-4100
*Attorneys for Plaintiffs-Appellants*
*Marathon Structured Finance Fund, LP,*
*NewStar Financial, Inc., and Munich Re*
*Capital Markets New York, Inc.*

# SPECIAL APPENDIX

i

## Special Appendix Table of Contents

**Page**

Order and Judgment of the Honorable Katherine B. Forrest,
Dated October 31, 2014, Appealed From ........................... SPA-1

Excerpts from the Trial Transcript, Dated October 30, 2014
(Decision pp. 1593–1654) ....................................................... SPA-2

SPA-1

```
┌────────────────────────────────────┐
│ USDC SDNY                           │
│ DOCUMENT                            │
│ ELECTRONICALLY FILED                │
│ DOC #: _____              │
│ DATE FILED OCT 3 1 2014             │
└────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                                        :
ALLIANZ RISK TRANSFER AG,                               :
MARATHON STRUCTURED FINANCE                             :
FUND, LP, NEWSTAR FINANCIAL,                            :
INC., and MUNICH RE CAPITAL                             :
MARKETS NEW YORK, INC.,                                 :
                                                        :
                              Plaintiffs,               :        08-cv-10420 (KBF)
                                                        :
                     -v-                                :            ORDER
                                                        :
PARAMOUNT PICTURES                                      :
CORPORATION,                                            :
                                                        :
                              Defendant.                :
------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

        For the reasons stated on the record on October 30, 2014, the Court hereby

enters judgment for defendant on all three claims in the Third Amendment

Complaint.  This constitutes the Order and Judgment of the Court.

        The Clerk of the Court is directed to enter Judgment and to terminate this

action.

        SO ORDERED.

Dated:        New York, New York
              October 3 1, 2014

                                            _____
                                                 KATHERINE B. FORREST
                                                 United States District Judge

**ALLIANZ RISK TRANSFER, INC. et al., v.**
**PARAMOUNT PICTURES,**

October 30, 2014

| EAU3ALL6 | Rebuttal - Mr. Kendall | Page 1590 |
| --- | --- | --- |

1 20 percent as a component for which Paramount received a fixed
2 amount. The economic effect was the same, plus they got the
3 premier.
4     Other than that, your Honor, I don't think I have
5 anything else that I haven't pretty well outlined in my
6 statement. Thank you very much for the Court's attention. And
7 I would leave it at that.
8     THE COURT: Thank you.
9     Mr. Charron, anything further from you?
10     MR. CHARRON: Just one point, your Honor. Only that
11 Mr. Kendall when discussing Mr. Fier's damages aspect of the
12 report made a statement. Mr. Wunderlich, who is in the
13 courtroom today, his report says that there was enough money
14 for 12 more films. And that issue has been before your Honor
15 in other motion practice. I just wanted to highlight -- 12 on
16 top of 25. If I didn't make that clear. So 37. So, I take
17 issue with that statement, that there is some question here.
18     THE COURT: I thought that that was if the revenues
19 had been as plaintiffs asserted, then there would have been
20 enough money to have fed back in for the other 12.
21     MR. CHARRON: Can I use your Honor's tag rule?
22     THE COURT: That's fine. It is not a big point I
23 think.
24     MR. JANOWITZ: It I think it is actually a very big
25 point. Because, our clients saw these elements, these release

| EAU3ALL6 | Rebuttal - Mr. Charron | Page 1591 |
| --- | --- | --- |

1 slate elements at a point where there were supposedly 20 films
2 addressed, even though those films were not fully addressed.
3 What Mr. Wunderlich is saying, and the reason we have this 25
4 37 dispute is if the presales had been done the way we think
5 they should have been done, it would have turned into a slate
6 of 37 films.
7     THE COURT: But then you would have shown a different
8 kind of drawdown as well, because your revenue flow would have
9 been different.
10     MR. JANOWITZ: No, your Honor. Revenue has absolutely
11 nothing to do with it.
12     THE COURT: We don't even need to go into it.
13     MR. JANOWITZ: It is only as a function of the
14 presales. Because presales reduce costs, which means the money
15 can go further. So there is no question that this could have
16 been a 37 film slate, it could have been a 38, it could have
17 been a 40, it could have been a 32.
18     The whole point is, that at the 20 point, you didn't
19 know where you were in the slate. And there could have been a
20 great deal ahead of you. So you're standing in the middle of a
21 transaction and you don't know where it's going to end up.
22     THE COURT: Is there anybody -- and I'm thinking
23 through Mr. Seery, and I'm not thinking of it in Mr. Seery, and
24 I'm not thinking of where in the record that point was made.
25 In other words, as I understood your client's use or non-use of

| EAU3ALL6 | Rebuttal - Mr. Charron | Page 1592 |
| --- | --- | --- |

1 those documents, the main reason that they discarded them was
2 because of the disclaimer and the fact that they believed
3 things would change. And nobody said, although that's
4 certainly a possibility of change, but nobody specifically
5 called out.
6     MR. JANOWITZ: I believe we had -- I believe we had
7 trial testimony which said that they did not know how big the
8 slate would be.
9     THE COURT: That's for sure. That I agree. That was
10 it was a moving target, the first four films that were
11 originally considered to be part of it because of timing
12 weren't part of it.
13     MR. JANOWITZ: Everybody understood the nature of the
14 deal. So if you understood the nature of the deal, you would
15 have known it then too. It is not a difficult thing to follow.
16     THE COURT: All right. Why don't we take a break.
17 And I need to sort through a couple of things and I've got a
18 couple of cases that I need to take a look at. Why don't we
19 take five to 10 minutes. All right.
20     (Recess)
21     THE COURT: Thank you. I, as you folks know, take a
22 lot of notes and have kept a lot of notes and have now sorted
23 through the notes, as I had really been doing all along. And
24 I'm going to now give my full ruling on the record, including
25 my findings of fact and conclusions of law.

| EAU3ALL6 | Decision | Page 1593 |
| --- | --- | --- |

1     The motion as we know that's been brought was brought
2 pursuant to Rule 52, and as you folks know, that after a party
3 has fully been heard on an issue tried to the bench, the Court
4 can render judgment on partial findings. The Court does have
5 to state its findings with specificity and state its
6 conclusions of law as well.
7     What I am going to do now is set forth the findings of
8 fact and those conclusions of law. There will be no separate
9 written opinion. This is it. So you folks will have this,
10 you'll be able to take a transcript.
11     As you folks know, you know better than I, you've
12 lived through it, this action was commenced in 2008 and it is
13 now 2014. As you folks know, this matter was transferred to me
14 the day before you began trial. In fact, the day you thought
15 you were going to trial. And you thought it was going to be a
16 jury trial, and it became a bench trial for reasons that I
17 think we've gone over sufficiently.
18     The parties have presented both the plaintiffs'
19 affirmative case and then the cross-examination over the course
20 of two weeks. And I do want to say that I appreciate the fact
21 that, as Mr. Charron said, that different judges make different
22 rulings and have different views of things. I understand that.
23     It is clear to the Court by more than a preponderance
24 of the evidence that judgment must be and hereby is entered in
25 favor of the defendant.

**ALLIANZ RISK TRANSFER, INC. et al., v.**
**PARAMOUNT PICTURES,**

October 30, 2014

| EAU3ALL6 | Decision | Page 1594 |

1    I do, however want to say in particular that I think
2  Mr. Janowitz and Mr. Charron are extremely professional,
3  competent trial counsel. That you folks know the law, I
4  disagree with you on some of your views of the law, but you
5  certainly know the cases and are fluent in the cases, that you
6  know the facts, and I think it is hard to imagine how anyone
7  could have done a better job with the facts that you had.
8    In particular, I thought that Mr. Charron's remarks in
9  opposition to the motion were particularly well organized, and
10  did about the best presentation I could imagine on those facts.
11    I want to say that because, while I don't agree with
12  plaintiffs on their view of the facts, I want you folks to know
13  that I did appreciate how you litigated the case.
14    Let me go on now to some of the other pieces. At this
15  trial, as you folks know, the Court has received numerous
16  documents. I have looked at each of the documents to which I
17  was referred, and also the documents that were contained in the
18  various binders that were handed to me as received documents.
19  So I believe I've looked at all of the documents that I
20  received into evidence. Certainly every document that folks
21  went over today were documents which had been well-tread. And
22  I have a fair amount of familiarity, with the exception of the
23  board minutes which I pulled and looked at, and the exhibit
24  from Mr. Badagliacca, 343. Those I've now looked at in
25  addition.

| EAU3ALL6 | Decision | Page 1595 |

1    I have also heard from the various representatives of
2  the various witnesses. I've heard from Merrill Lynch through
3  Mr. Hoffman, Mr. Maslansky, plaintiff's proposed expert
4  Mr. Sands, Paramount's Ms. Magid. I've read the deposition
5  designations of over a dozen other witnesses. I heard from
6  each of the plaintiffs. So I've had access to a fair amount of
7  testimony, some of which has occurred over a number of years.
8    With the exception of Ms. Magid, the Court does find
9  that the live witnesses were, frankly, generally rehearsed.
10  That's not unusual, however, in cases where there have been
11  depositions and there have been meetings with clients over a
12  number of years. But they did have their talking points down.
13  Sometimes that required the Court to discount testimony,
14  sometimes it didn't.
15    With Ms. Magid I do want to note that I heard her
16  testimony a little differently from Mr. Charron. Mr. Charron
17  has lived through this case for a lot longer. But the way
18  Ms. Magid came across to the Court when she was testifying was
19  as someone who was trying to be forthcoming. And it didn't
20  actually strike the Court as particularly unreasonable,
21  although perhaps a practice that ought to be reconsidered, that
22  a person in a very busy department might sign things which are
23  initialed by others. That has happened in my professional
24  experience, so I don't find it to be -- I don't do it, but I
25  don't find it to be something that is not credible.

| EAU3ALL6 | Decision | Page 1596 |

1    I do want to say that with Springer in particular, he
2  was the one who I had the most difficulty with. I found him
3  overly rehearsed, and to have the talking points that seemed to
4  me to be down almost word for word in some respect as his
5  lawyers. And he did testify, and it was notable at his
6  deposition, in a manner that lacked recollection which he then
7  had recollection here. That also is not an extraordinary thing
8  in and of itself, but it is something that goes into the mix.
9    A separate word on Mr. Sands. I don't rely on his
10  testimony really at all. It's not because he lacked
11  credibility. But rather, it's because the Court finds that he
12  lacked an adequate methodology to render the opinions that he
13  rendered, and a lack of relevance to the extent he rendered
14  opinions with any basis in fact. I have no doubt that he is
15  highly experienced in many areas in the movie industry, and
16  that he did all of the things he testified to having done.
17  But, nonetheless, the opinions that he rendered weren't
18  supported with the kind of methodology that would assist the
19  trier of fact here. His opinions appeared to be from the gut.
20  Somebody who has got a lot of experience can certainly have
21  views from the gut. But, in order to be an expert witness,
22  you've got to vigorously find a way of supporting them, and his
23  were largely ex post. He also doesn't have the requisite
24  experience selling the number of pictures he thought could be
25  sold in the number of territories which would have been had to

| EAU3ALL6 | Decision | Page 1597 |

1  have been, if not in a row, in relative proximity to one
2  another, at least from the Paramount side, given the number of
3  pictures that were going into the Melrose slate.
4    So, his opinions in my view were anecdotal and without
5  reference also to certain pertinent facts relating to
6  particular films at issue, as well as the particular marketing
7  context in which those films would have been marketed. He
8  ignored Paramount specific rights as to what it could and could
9  not sell. As well as, we've said, the market conditions in
10  2004.
11    Now, I want to note that I have considered each of the
12  plaintiffs individually. As I go through my remarks, if I
13  don't call them out in particular each time, it is because I'm
14  skipping over something in my notes. But I have in fact given
15  consideration to whether or not each of the plaintiffs
16  individually has met each of the elements. And the result is
17  the same for each of them.
18    I'm going to now state some findings of fact as well
19  as conclusions of law. Each of the findings which I state,
20  each of the factual statements that I make are found by a
21  preponderance of the evidence.
22    I find that the plaintiffs are sophisticated investors
23  who each invested millions of dollars in this security tied to
24  the performance, as we know, the Paramount Melrose slate.
25  Their sophistication is evidenced by a number of things that

**ALLIANZ RISK TRANSFER, INC. et al., v.**
**PARAMOUNT PICTURES,**

**October 30, 2014**

| EAU3ALL6 | Decision | Page 1598 |
|---|---|---|

1 are in the record. It is indeed not even a contested fact.
2 But Merrill Lynch itself stated that, through Mr. Hoffman, that
3 the plaintiffs were sophisticated investors. They each asked
4 for information and due diligence that a sophisticated investor
5 would be expected to do.
6     Allianz's Mr. Flynn as well as Mr. Seery, evident from
7 his deposition designations, were sophisticated investors.
8 Mr. Burnaman had 20 years of experience, and indeed he had
9 provided expert testimony on reps and warrantys in the past.
10 No doubt he was sophisticated and is sophisticated.
11 Mr. Hohmann from Munich Re had significant industry experience
12 and is also certainly sophisticated. Springer with Marathon
13 had significant experience in structured finance. Indeed,
14 Marathon itself specializes in high-yield investments of which
15 it hoped this would be one. And Springer testified that both
16 he and Marathon were generally sophisticated investors.
17     In addition to that, the subscription agreement
18 itself -- more on that in a moment -- which I do find is
19 binding on each of the plaintiff investor has a section in
20 paragraph 4(d) as in David on page eight, and 4(e), in which
21 each of the subscribers represents that each is a sophisticated
22 investor.
23     Now, as it turned out, as we all know, the films on
24 the Melrose slate which was the asset securitized in the
25 Melrose transaction did not do well. And it certainly didn't

| EAU3ALL6 | Decision | Page 1599 |
|---|---|---|

1 do as well as people had hoped, both Paramount as well as the
2 plaintiffs, and plaintiffs lost their principal as well as the
3 expected full interest, and this lawsuit followed.
4     The plaintiffs made a risky investment. They knew
5 that. They testified to that. There were risks involved.
6 There is no doubt about that. The evidence at trial
7 established that the class B notes were unrated, and that the
8 class A notes were ahead of them in the waterfall. Those class
9 A notes were rated at the lowest level of Moody's before you
10 get to the unrated status, junk status.
11     The witnesses testified to understanding that there
12 were risks in the investment, that the Melrose securities did
13 not provide a guaranteed return. This was not an investment
14 that one would sell to a person trying to preserve capital.
15 That does seem to be clear. This was a bet. The plaintiffs,
16 what they hoped for, it never materialized. All the risks,
17 however, about which they believed they were misled, the Court
18 does find that they were disclosed and that there was no fraud
19 here.
20     The Court also finds in particular that there were no
21 false statements, that there were no actionable omissions,
22 though there was I note one omission before when I went over
23 misstatements and omission, and today I think it's been recast
24 as more omissions. Either way, I don't find that there are any
25 actionable omissions. I don't find that the alleged

| EAU3ALL6 | Decision | Page 1600 |
|---|---|---|

1 misstatements or the omission were material. I don't find that
2 there is sufficient evidence of scienter. I don't find that
3 there is sufficient evidence of transaction causation or loss
4 causation.
5     The basic claim is that the PPM in isolation or
6 combined with the HDS committed Paramount to maintaining a
7 level of foreign presales for films on the slate that it had
8 previously obtained and/or to engage in the same kind of risk
9 mitigation in the form of a particular type of co-financing,
10 namely foreign presales, that it had done in the past. Or that
11 Paramount omitted to tell the plaintiffs of a changed business
12 practice to do fewer foreign presales, thereby altering its
13 risk mitigation practices.
14     Notably, plaintiffs are not asserting as a result of
15 the Melrose securitization Paramount bound itself in any way
16 not to alter its domestic strategy, but somehow that there were
17 statements that Paramount bound itself to a particular set
18 of business actions and strategies in foreign territories.
19     The Court also does not find that there was a coverup
20 of a known change in fundamental business plan such as foreign
21 presales.
22     From a business perspective, I would note this doesn't
23 make a lot of sense. If Paramount had bound itself to foreign
24 presales, that does seem to fly in the face of good negotiating
25 strategy, because everybody in the world would then know that

| EAU3ALL6 | Decision | Page 1601 |
|---|---|---|

1 you had given up your negotiating leverage and that they would
2 have to obtain a certain number of foreign presales in certain
3 territories because they would be so bound. So to bind oneself
4 to taking that kind of strategic action doesn't make a lot of
5 sense. Binding Paramount to have to achieve a business
6 arrangement with third parties would have handed them certain
7 leverage and changed dynamics, but the alleged coverup also
8 doesn't make a lot of sense. It doesn't make a lot of sense to
9 hide only one small relatively small piece, although a somewhat
10 big dollar amount, depending on how you count it, in a litany
11 of other pieces.
12     And, frankly, the Court does not find there is a
13 fundamental business change. I'll get to that in a moment.
14     For all of the reasons I'm now going to go into some
15 more detail, on I find that counts one through three judgment
16 is entered in favor of the defendants.
17     There are numerous reason why is this is so. Any one
18 of the elements and the failures in the elements individually
19 and independently can support judgment on each of the claims.
20 I don't think this is, frankly, a close call.
21     I am not going to rule on the Janus issue. I don't
22 think I need to. It is not critical to the Court's
23 determination. And therefore, I'm not addressing that.
24     Now I want to go over the documents that are operative
25 here. Documents which are relevant and that govern the

**ALLIANZ RISK TRANSFER, INC. et al., v.**
**PARAMOUNT PICTURES,**

October 30, 2014

| EAU3ALL6 | Decision | Page 1602 |
|---|---|---|

1 relationship. There are two primary documents, but there are
2 some additional documents as well which I want to review.
3     First of all, I want to go over the subscription
4 agreement which each of the investor plaintiffs signed and is
5 bound by, and the PPM, the private placement memorandum, as
6 well as certain of the others. All of these documents are
7 relevant to the dispute.
8     I do note that I do believe that PX 642, which is the
9 subscription agreement, I do believe that the waiver is valid
10 and enforceable. I do believe that plaintiff investors waived
11 their claims. I also believe that there is no legal reason why
12 that claim waiver would not apply as a matter of law. There is
13 no basis for disregarding the subscription agreement. The
14 plaintiffs agreed to be bound by it, and they should be so
15 bound.
16     Now the subscription agreement notably references the
17 indenture agreement. It references the PPM, it references
18 internally the LLC and the RPA. Those references are all
19 contained on page five. And I'll go through as a result some
20 of the other provisions of those agreements, which are
21 referenced as the investors having been aware of.
22     But in terms of the subscription agreement itself,
23 paragraph 4(c), page seven, there's a statement that the
24 investor has received and reviewed the information, and it is
25 not basing its decision on any information provided by

| EAU3ALL6 | Decision | Page 1604 |
|---|---|---|

1 Distribution always incorporates money. So far as the record
2 here indicates, which is all of the theatrical releases, all of
3 the films were being shown domestically and in foreign
4 jurisdictions for pay, not for free.
5     And then of course also in (s)(vii), part of which is
6 just not applicable, but it talks about the covered pictures
7 not being marketed pursuant to a particular plan.
8     In paragraph 4(t) there is a waiver. And there is an
9 agreement by the plaintiffs in no event to bring any claim. As
10 I said, I do find that is binding.
11     Paragraph 9(f) we've been over that. That's
12 important. And paragraph 16 there is the general disclaimer.
13 General disclaimers of course have some limitations when
14 they're not specific. However, they are not to be ignored
15 entirely because they are general. They are to be taken into
16 consideration along with the totality of the facts and
17 circumstances. And therefore, the general disclaimer
18 reinforces the disclaimers referenced elsewhere in the
19 subscription agreement.
20     The RPA, which is DX 2 is another document that was
21 referenced in the subscription agreement. Paragraph 3.2.1
22 references the covered picture obligations. This was reviewed
23 at trial. That Paramount shall control all decisions as to
24 whether to pursue or consummate any co-financing transactions.
25 That was disclosed. Paragraph 10 there is a reference to

| EAU3ALL6 | Decision | Page 1603 |
|---|---|---|

1 Paramount.
2     Paragraph 4(e), page eight, that none of the relevant
3 parties is acting as a fiduciary and the plaintiffs are not
4 relying on reps, written or oral, of Paramount or Merrill
5 Lynch, other than that which is contained in the PPM.
6     And of course, that does not limit the PPM from itself
7 containing a series of disclosures. These are complex
8 structured finance documents, which each of the sophisticated
9 plaintiff investors would know how to read and to follow the
10 trail of the documents.
11     Paramount in that same paragraph does not give any
12 representations. Paragraph 4(s) states: None of the relevant
13 parties has made any express or implied representation, among
14 other things, (s)(iii) that the covered pictures will perform
15 in any particular manner or will be distributed in any
16 particular manner.
17     I do find that distribution is a term which sometimes
18 encompasses financing and sometimes may just be about
19 transferring a picture from here to there. But always it's in
20 connection with money. Distribution of films has never been
21 disconnected from the financial implications of money.
22 Financing can, of course, have a broader definition and may or
23 may not have anything to do with actual distribution.
24     So financing can be one term, and it may at times
25 incorporate distribution, but it may at other times not.

| EAU3ALL6 | Decision | Page 1605 |
|---|---|---|

1 distribution of covered pictures that Paramount shall have
2 complete authority to license, market, and exploit the covered
3 pictures and all rights therein or to refrain from doing so in
4 accordance with sales practices as they determine.
5     The indentured, DX 13 attaches Exhibit E, has in it
6 attached as Exhibit E general reps and warrantys of the
7 transferee. And in big paragraph C, they rep that they have
8 read and understood that the risks as disclosed in the PPM.
9 And big paragraph E they confirm also that Paramount very
10 importantly was not acting as a fiduciary and was not providing
11 any guarantees.
12     The PPM is Plaintiff's Exhibit 601. Plaintiffs claim
13 that the PPM in part either set forth certain commitments by
14 implication, or explicitly, or acted as a coverup. I do not
15 agree with that reading of the PPM. The PPM never commits to
16 any particular method for foreign distribution in the future.
17 It never commits to maintaining a prior business strategy for
18 the future. It doesn't commit to doing any particular kind of
19 marketing. It does commit, if one were to take it that far, to
20 marketing the picture. But whether or not the pictures would
21 be marketed on 1,000 screens domestically or 1,000 screens in
22 Germany, is not committed to. And there is no reason to
23 differentiate between the 1,000 screens domestically and 1,000
24 screens in Germany.
25     The first page of the PPM states it should not be a

**ALLIANZ RISK TRANSFER, INC. et al., v.**
**PARAMOUNT PICTURES,**

October 30, 2014

1 basis for any investment decision, and none of Merrill Lynch or
2 Paramount have any obligations for forward-looking statements,
3 and that there is no standing or recourse against Paramount. I
4 do find that is a statement which has real meaning and does
5 indicate that the plaintiffs here should not have had standing
6 or recourse against Paramount.
7          There is also large typeface in a bold general
8 disclaimer, but it is on page three. It is not at the end, it
9 is not buried, it's there, it is right in the face of the
10 document, that none of Paramount and some others assumes any
11 liability for the adequacy or accuracy of information.
12          Page six of the PPM refers in the past tense to
13 Paramount has pursued. Not Paramount will pursue. And I'll
14 come back over that in a moment.
15          Article III is entitled investment considerations. It
16 is a number of statements which should have warned investors
17 that there were no guarantees as to how Paramount would choose
18 to conduct its business. It states on page 31, and we'll come
19 back to that, that there can be no assurances that Paramount
20 will implement the same techniques or achieve similar results
21 as it has in the past.
22          Article IV has certain risk factors in referring to
23 the uncertainty of success, the uncertainty of production and
24 distribution, that the investment is not liquid, that all the
25 decisions relating to covered pictures were within Paramount's

1 control, that Paramount may modify, amend, cancel or adjust all
2 agreements and policies relating to distribution. That last
3 part is on page 36.
4          It refers to the film industry risk, that there are no
5 guarantees that the market will remain constant. And that
6 distribution is a risk. And that all factors can change.
7          In the article V which is the Paramount business
8 overview, it is disclosed that Paramount selectively pursues
9 and enters into co-production agreements, and that others may
10 receive certain distribution rights, and that these may include
11 worldwide distribution or other territorial rights.
12          Now, a word on Paramount's sending the general
13 disclaimer language to Merrill Lynch. And that it was comedic
14 to suggest they could both sign off on it as well as send in
15 the general disclaimer language. I actually see it
16 differently. Because you can legally disclaim something and
17 still have drafted it. And the drafting of a legal document
18 which contains a disclaimer is not inconsistent with a
19 disclaimer. It is a legal obligation versus whether or not
20 factually they touched a particular document.
21          Now, the Monte Carlo, based on the HDS, the historical
22 data set, and there are various documents to look at in this
23 regard. PX 433, PX 898, PX 899, they also contain disclaimers.
24 Each plaintiff testified to having received the Monte Carlo
25 analysis prepared by Merrill Lynch. Those documents say on

1 their faces, no assurances, these documents are hypothetical
2 only.
3          In addition, there is the confidentiality agreement
4 which the plaintiffs signed. They also contain disclaimers.
5 That's DX 95 is an example, which states you acknowledge that
6 none of us or Paramount dot, dot, dot, makes any express or
7 implied representation or warranty as to the accuracy or
8 completeness of proprietary information.
9          There is also the term sheet which Marathon at least
10 received, I don't know if there are other versions of it in the
11 record, at DX 96 which also contained a disclaimer by Paramount
12 on page one that they have no responsibility for the
13 information on page seven under their responsibilities and
14 obligations. That Paramount will market and distribute as it
15 deems appropriate in the exercise of its business judgment.
16          There is also a general disclaimer in that document on
17 page 15.
18          Let me go on now to the general principles of
19 securities law. I think that we all know and understand that
20 we're governed by rule -- well, section 10(b) and Rule 10b-5.
21 And I would point for the elements of a securities claim to the
22 Dura case, 544, U.S. 336 at 341 (2005). We all know that Rule
23 10b-5 forbids, among other things, the making of any untrue
24 statement of material fact or the omission of any material fact
25 necessary in order to make the statements made not misleading.

1          So to prevail on a claim on a Section 10(b) and Rule
2 10b-5, a plaintiff has to prove by a preponderance of the
3 evidence that defendants have made a material misstatement or
4 omission with scienter in connection with a purchase or sale of
5 securities, and have reliance or transactional causation and
6 loss causation, along with economic loss.
7          The "in connection with" element is not in dispute.
8 Nor is the fact of economic loss. And loss causation we'll go
9 into more in a few moments.
10          The securities law as we know from Dura and from the
11 Supreme Court are not intended to protect or be a general
12 insurance policy against investors to protect from market
13 losses. That's Dura at 345.
14          Now let's talk about the misstatements and the
15 omission. To be liable, as we've said, there has to be a
16 material misstatement or omission. I'm going to get to
17 materiality in a moment. I don't deal with Janus and who the
18 maker is. But the statement has to have been false at the time
19 it was made. And that's the San Leandro Emergency Medical
20 Group, 75 F.3d 801, 812-813 "A statement is false if it is not
21 truthful. Mere apprehension, misunderstanding or mistake of
22 fact do not suffice to establish falsity." That's at page 813.
23 The Second Circuit has repeatedly stated that plaintiffs have
24 to do more than simply assert that a statement is false. They
25 have to prove it. They've got to state with specificity why

ALLIANZ RISK TRANSFER, INC. et al., v.
PARAMOUNT PICTURES,

October 30, 2014

| EAU3ALL6 | Decision | Page 1610 |

1 it's false. And after a trial, at least in terms of the
2 plaintiffs' affirmative case, they have to prove that by a
3 preponderance of the evidence.
4 Now, there are a couple of aspects to falsity. Where
5 a plaintiff asserts falsity of a statement of belief or
6 opinion, they have to -- or otherwise asserts falsity -- they
7 have to assert that it was objectively false as well as that it
8 was false at the time it was expressed.
9 Now, statements regarding future projections of
10 performance can be actionable if they're worded as guarantees
11 or supported by specific statements of fact or if the speaker
12 doesn't reasonably or genuinely believe them. That's the IBM
13 case 163 F.3d 102, 107, the City of Pontiac case, the Water
14 Works case, the 11th Circuit case. Those deal with some of the
15 kind of language here.
16 Here the language of the alleged misstatements, which
17 we're going to go over in a moment, which are statements one
18 through five, are inactionable as a matter of law if they are
19 considered to be misstatements. And the cases are those cited
20 above as well as there were some additional cases cited by
21 Mr. Kendall that all go to the same point.
22 In addition, plaintiffs have failed to prove by a
23 preponderance of the evidence that the statements at issue were
24 false. In fact, I would say not just a failure of proof as to
25 falsity. The evidence in the record, the Court finds,

| EAU3ALL6 | Decision | Page 1611 |

1 demonstrates the truth of the statements. And that in the
2 absence of a false statement, of course, no claim can lie.
3 The five alleged misstatements, and again, I'm going
4 to address the omission in a moment, because I do know there is
5 a shifting whether it is misstatements or omissions. But as we
6 discussed the other evening when I went through them, the
7 misstatements were statement one, page six of the PPM in
8 seeking to limit paramount's financial exposure. Paramount has
9 pursued a strategy of entering into agreements to share the
10 financing of certain films. It is in the past tense. It is
11 retrospective. Springer stated he understood that. There is
12 also statements elsewhere about Paramount using UIP. We'll go
13 through these again.
14 Statement two is on page 31 of the PPM. That's the
15 "like other major studios" language. It talks about Paramount
16 opportunistically entering into output agreements. There is
17 nothing specific beyond it being opportunistic. There is no
18 guarantee that certain things are going to happen. They're
19 going to happen more than on a sporadic basis or even at all.
20 "Opportunistic" means an opportunity definitionally has to
21 arise which one takes advantage of. And also the fact of
22 foreign presales is only one among several different
23 potentials.
24 The same page, page 31, also discusses leveraging
25 Paramount's global distribution infrastructure. The "no

| EAU3ALL6 | Decision | Page 1612 |

1 assurance" language that Paramount will implement the same
2 techniques or achieve similar results in the future. So that
3 clearly states there is no assurance to implement those same
4 techniques.
5 There is no reason to ignore this paragraph. It can't
6 just be put to the side. There is no legal or reasonable
7 reason to do that.
8 And bottom of that page also again references
9 Paramount's own extensive worldwide marketing and distribution.
10 Page 36 references that Paramount has complete
11 authority to license and market and exploit or refrain from so
12 doing its films.
13 Statement number three is on page 39, which references
14 the historically Paramount has managed its business guided by
15 the following strategic objectives. And one of those is
16 emphasis on a culture of fiscal caution through continuous
17 budgetary scrutiny and opportunistic risk sharing financing.
18 That's backward looking. It's true.
19 Statement four on page 39 which is Paramount
20 selectively pursues and enters into co-production agreements,
21 studio shared pot deals, split rights deals, and similar
22 arrangements depending upon the situation. These agreements
23 limit Paramount's risk relating to a motion picture's
24 performance. The "selective" is not a word of commitment, of
25 quantity. Shared pot deals are various kinds of forms of

| EAU3ALL6 | Decision | Page 1613 |

1 diversification. There were five split rights in the Melrose
2 slate. And we'll go into some other additional facts in a
3 moment.
4 Statement five is on page 40. I think this one may
5 have been just dropped, it may not be relevant anymore because
6 it hasn't been raised recently by the plaintiffs. But
7 nevertheless that's the language "Paramount complements its
8 risk mitigation strategy by entering into financial
9 transactions with third parties that are designed" dot, dot,
10 dot, "to further reduce capital risks." The tax credit deals,
11 there is no question that the tax deals did act as a form of
12 risk mitigation. But part of that section also references the
13 selection, the selective entering into of co-production
14 agreements.
15 And under theatrical distribution on that page, it
16 also references that internationally Paramount generally
17 distributes through UIP, and it informs readers by virtue of
18 that, that there are many instances where it would retain
19 rights.
20 And also, it states on page 40 that outside the U.S.
21 Paramount distributes the home video market through PHEI, and
22 the fact of home video rights outside of being sold in and of
23 itself could lead to impacts on the ability to sell foreign
24 presales.
25 There is also language on page eight relating to

**ALLIANZ RISK TRANSFER, INC. et al., v.**
**PARAMOUNT PICTURES,**

October 30, 2014

| EAU3ALL6 | Decision | Page 1614 |
|---|---|---|

1 covered pictures. The PPM also clearly states that all
2 decisions related to covered pictures remain with Paramount and
3 are in Paramount's control. It is on page 36 as we've said.
4 And also that it has a right to change it business strategy,
5 also on page 36.
6     So together, as I'm going to discuss, these render any
7 reliance unreasonable. I'll talk about that more. As a matter
8 of law, the words that are used, selective, opportunistic,
9 fiscal caution, backwards looking, those are not actionable.
10 They're puffery, they're vague, they're not promises, they're
11 not guarantees.
12     I want to turn to the evidence in the record which
13 indicates a lack of falsity. First of all, there is nothing
14 unusual about the PPM. They don't do anything
15 particularly unusual. Mr. Maslansky testified to that. He
16 testified that he was hired to look at the PPM, and to
17 determine whether there was anything unusual about it. He
18 didn't see anything unusual.
19     Now, if the PPM had bound Paramount forevermore to do
20 a particular kind of co-financing in the foreign jurisdiction,
21 that would have been unusual. That would have been a kind of
22 binding. That would have been a change. How do we know that?
23 We know that from the record evidence which shows variability
24 year to year. The very variability of each of the co-financing
25 types indicates that Paramount would have been changing its

| EAU3ALL6 | Decision | Page 1615 |
|---|---|---|

1 business to have bound itself to one or the other type or to
2 any type.
3     The trial record does not support Paramount ever
4 having made a commitment in the past to do or refrain from
5 doing a particular act for purposes of risk mitigation. That
6 Paramount, as a reasonable company, engaged in risk mitigation,
7 that simply states the obvious. It doesn't bind Paramount to a
8 particular version of risk mitigation, X agreements, for
9 instance, for X territories, for X amount of money, even within
10 a range that is binding it.
11     Now, the PPM, to have made a specific commitment with
12 respect to a particular type of risk mitigation or a particular
13 type in quantum of co-financing would have required certain
14 things. And that would have required a commitment or a
15 guarantee, which is not there.
16     Now, all of the statements which are referenced as
17 I've just set them out, statements one through five, those
18 which refer to the past were true. In fact, I believe that is
19 plaintiffs' case, which is that those statements of past
20 practice are true. That co-financing was used as a method of
21 risk mitigation. That is, shared risk with others through a
22 co-financing arrangement.
23     But there are many forms of risk mitigation, as I've
24 said, and they're highly variable. It is true that Paramount
25 did opportunistically enter into territorial sales, and it did

| EAU3ALL6 | Decision | Page 1616 |
|---|---|---|

1 so with respect to some of the Melrose slate.
2     It is also true that in the past and during the time
3 of the Melrose slate, Paramount had used other methods of risk
4 mitigation. Making a good film, for instance, with solid stars
5 who are known to the box office to be a good draw is a form of
6 risk mitigation.
7     Paramount had used in the past foreign presales as one
8 form of risk mitigation. But the record is clear that that was
9 not for all films, not for all territories. It was highly
10 variable. It was, as the statement in the PPM demonstrates,
11 selective and opportunistic.
12     Thus, all the statements one through five, to the
13 extent they referred to what was done in the past or imply what
14 was done in the past, are literally true.
15     Now, we heard counsel argue that some of the former
16 misstatements, numbers one, three and four, may be true in the
17 past but they constitute an actionable omission, and that was
18 what Mr. Charron posited today. And I'm going to address why I
19 don't think that, even if one takes those as omissions, they
20 are actionable. So either way, those statements the Court
21 finds are not actionable.
22     To the extent that plaintiffs assume they could count
23 on a continuation of one through five, statements one through
24 five in the future, they needed some language indicating a
25 commitment or something that was predictive of the future.

| EAU3ALL6 | Decision | Page 1617 |
|---|---|---|

1 There is no such language. In fact, there is the opposite.
2     This confuses, I believe, risk mitigation with risk
3 elimination. And there is no language that ever suggests risk
4 elimination. Paramount never claimed to have eliminated risk.
5 If they had, they would have had the secret sauce, and I
6 presume they would have sold it to the market. Because risk
7 elimination would be something that every company would sorely
8 and dearly love to have.
9     I do find by a preponderance of the evidence that they
10 did not make a commitment to any type of particular action to
11 the future.
12     Persuasive in this regard is also the fact that there
13 is no evidence that plaintiffs ever sought a commitment as to a
14 particular form or number of foreign presales or indeed a
15 particular form of risk mitigation. Instead, plaintiffs sought
16 assurances that business would continue as usual. And so it
17 seems by the evidence, and the Court so finds, that it did.
18 Paramount continued to make and market movies. It did so
19 according to its best business judgment at the time. That's
20 the evidence in the record. That's what they committed to do.
21 That's what they did. There was no fundamental change in
22 business strategy that would rise to the level of not business
23 as usual.
24     No plaintiff said they had a guarantee. Indeed, they
25 testified to the opposite. And none had sought such.

ALLIANZ RISK TRANSFER, INC. et al., v.
PARAMOUNT PICTURES,

October 30, 2014

| EAU3ALL6 | Decision | Page 1618 |

1    To the extent that plaintiffs are alleging and have
2  asserted that Paramount failed to engage in any reasonable risk
3  mitigation as they had in the past, that's also disproven by
4  the record.  Indeed, the Melrose LLC, as Mr. Springer
5  testified, was itself a form of risk mitigation.
6    Melrose LLC raised over $200 million as a form of
7  co-financing.  So as a matter of fact, Paramount had engaged in
8  significant risk mitigation and significant co-financing, just
9  by virtue of the Melrose slate.
10    DX 252 shows Melrose financing of 232.  Other
11  co-financing in the amount of 274 -- these are in millions of
12  dollars -- for a total of over $500 million.  This was a
13  significant risk mitigation.  Whether plaintiffs like the fact
14  that they were part of the risk mitigation is a separate issue.
15  It doesn't make the fact of it untruthful.
16    Robert Friedman, the person at Paramount who was in
17  part responsible for foreign presales testified at his
18  deposition, which has been designated, that he does not recall
19  any particular change in territorial presales.  Sherry Lansing
20  of Paramount, formerly of Paramount, testified similarly to no
21  change in practice.
22    PX 324, which are the board minutes.  The Court does
23  not see any decision coming out of that, apart from discussion
24  of risk mitigation, which I hope would be discussed at the
25  board level.  The Court does not find any indication that there

| EAU3ALL6 | Decision | Page 1619 |

1  was a change of practice in that document.
2    Similarly, David Friedman testified in a similar
3  manner.  He also testified that Paramount would look for
4  opportunities.  Tobey testified similarly.  Badagliacca also
5  testified to no change in a strategy of selling foreign rights.
6  Ms. Magid also testified at her deposition where she was
7  designated as a 30(b)(6) that she was not aware of any change
8  in Paramount's way of conducting business in the relevant time
9  frame.
10    (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| EAUFALL7 | Decision | Page 1620 |

1    THE COURT: That does not, of course, mean that
2  Paramount continued to do everything in exactly the same way it
3  had done in the past.  One would hope that it would always
4  attempt to improve on its business and it would undertake the
5  acts which it believed in its best business judgment and as a
6  rational economic actor would achieve the highest
7  profitability.  That, however, does not mean that if those
8  business judgments fail that they have engaged in fraud.
9  Indeed, one would assume that Paramount itself wanted and all
10  indications are that they did want, according to the designated
11  testimony, for these films to succeed in the biggest way
12  possible.  They were just disappointed in that hope.
13    So in addition to a lack of commitment to a particular
14  level of risk mitigation, co-financing and foreign presales,
15  the PPM and other documents also provide no basis for
16  assurance.  Nowhere in the HDS or in any other document, in no
17  testimony by any witness is there evidence that Paramount ever
18  stated that it was committed to or would engage in any
19  particular level of foreign presales with respect to particular
20  films or with respect to particular territories.
21    In addition to the fact that the PPM is generally
22  backward-looking there are a number of places in the PPM that
23  specifically caution the reader not to rely on anything
24  attributed to Paramount and Merrill Lynch.  This has
25  implications for reasonable reliance that I'll get to in a

| EAUFALL7 | Decision | Page 1621 |

1  moment.  But let's talk about the HDS and whether the HDS,
2  historical data set, when provided as a basis to evaluate how
3  slates had done in the past can provide an implicit commitment
4  for the future which is how it is being used.
5    The HDS are PX 899 and they were also used as the
6  basis for the Monte Carlo analyses which were run by Merrill
7  Lynch and which certain investors utilized for some of their
8  own modeling.  I don't believe that these assist the plaintiffs
9  in making out a securities fraud claim.  If Paramount had a
10  formula to replicate the average of historically positive
11  results year after year undoubtedly they would do so as a
12  rational business and they had not been shown in this trial to
13  have acted other than rationally.  Paramount did not provide
14  any guarantees with respect to the HDS and indeed accompanied
15  the HDS with a disclaimer.  Well, it accompanied the Monte
16  Carlos based on the HDS with a disclaimer.
17    It is up to the plaintiffs as investors to determine
18  how much weight to place on past performance of demonstrably
19  different films.  It is acknowledged and has been discussed
20  that each film has its own cast, it has its own appeal or lack
21  of appeal.  And therefore it cannot be assumed that a group of
22  films from the past is necessarily predictive of anything in
23  the future.  As a matter of fact, the evidence is that
24  co-financing, the numbers on the HDS included both foreign and
25  domestic in a combined number and it was not broken out by

ALLIANZ RISK TRANSFER, INC. et al., v.
PARAMOUNT PICTURES,

October 30, 2014

| EAUFALL7 | Decision | Page 1622 |
| --- | --- | --- |

1  particular type and no plaintiff ever sought to determine that
2  a specific amount of co-financing was attributable to specific
3  foreign presales for particular territories. The record
4  revealed instead there were several different types of
5  co-financing including split right deals, foreign presales and
6  others.
7       The footnotes to the HDS that were provided which are
8  at PX 864 make it clear that not all films have foreign
9  presales and that the amounts of any co-financing for films
10  varied considerably by percentage and type. The Court also
11  would refer to the demonstratives that were shown today, but
12  particularly to the underlying documents to those
13  demonstratives; those are demonstrative Court Exhibits 4
14  through 10, but the underlying documents at PX 850, PX 851, PX
15  838 and PX 864. Those documents together show a high degree of
16  variability of type and amount of the various kinds of
17  co-financing. They show no territorial sales in 1998, only a
18  few in 1999, 2000 has no shared pot, a few territorial. The
19  Melrose slate 2004 is ahead or at least not particularly
20  different from 1998. 2006 does in fact have some foreign
21  presales for the Melrose slate. And then again Court Exhibit
22  11, relying on the documents stated on that demonstrative, show
23  film-by-film the Melrose slate and there was some different
24  types of risk mitigation or co-financing in each category.
25       So let's turn to the use of the HDS. The HDS includes

| EAUFALL7 | Decision | Page 1623 |
| --- | --- | --- |

1  I think all kinds of co-financing and the Monte Carlo in
2  particular. The Monte Carlo analysis is at PX 898 and also PX
3  I believe 433. It has a general disclaimer in large font on
4  the front, as we said, that Paramount does not assume liability
5  for adequacy or accuracy. Page 3 talks about results, actual
6  results may vary and that in fact if you look at the Monte
7  Carlo you can see that co-financing varied year to year and in
8  fact, when you look at the fact that there were 10,000
9  variations it ran variability and co-financing.
10       Let me turn to some of the other evidence of no
11  falsity. Plaintiffs introduced Plaintiff's 330, an article
12  that the Wall Street Journal ran in March 2004 entitled
13  "Paramount Has a New Mantra - Taking Risks is Healthy. The
14  Court takes this article just for the fact that the article was
15  published, not for the truth of it. Now, Mr. Hoffman for
16  Merrill Lynch did say he spoke with investors about that
17  article and following that article Mr. McGrath from Paramount
18  told Merrill Lynch that there had not been, quote, "a
19  fundamental shift in Paramount's production strategy" and the
20  other statements he made in PX 331. This language, however,
21  does not provide any specific guarantee regarding any specific
22  actions. It's really quite broad, quite general. Nothing can
23  be based on that.
24       There's no specific evidence that McGrath himself was
25  intending to make a statement about foreign presales or levels

| EAUFALL7 | Decision | Page 1624 |
| --- | --- | --- |

1  of foreign presales or committing that he would engage in the
2  same number that you could obtain by running an average of the
3  HDS. There's nothing even close to that in PX 331. There's no
4  Paramount witness who's testified at deposition in the
5  designations or here at trial that that statement by McGrath
6  either directly or by hearing about it from Merrill Lynch, even
7  if that would be, I don't have to reach whether or not that's
8  something that could form the basis for security fraud, but no
9  witness said that they assumed that that meant a particular
10  level of foreign presales were going to be maintained
11  consistent with the HDS. And it's unreasonable to think that
12  it would.
13       The evidence at trial was that there had not in fact
14  been a material shift in strategy. The strategy provided to
15  the plaintiff as set forth in the PPM showed a multifaceted
16  strategy, that there were split rights, that split rights could
17  include all kinds of things, that there were multiple ways of
18  co-financing and that it varied all the time. So the world and
19  the investors in particular were on notice that there could be
20  changes just by virtue of results.
21       The PPM itself on page 36, as I've already described,
22  refers to Paramount's right to change its business strategy.
23  Whether or not Merrill Lynch itself took comfort in certain
24  communications it had with Paramount is really irrelevant to
25  whether investors, here plaintiffs, as a legal matter should or

| EAUFALL7 | Decision | Page 1625 |
| --- | --- | --- |

1  could have taken comfort in certain statements that were made
2  and disclaimed in the PPM. But let's take a look and just go
3  through some of the witnesses for a moment.
4       There is Mr. Burnaman of Newstar. He stated at page
5  975, no guarantees. He talked about no commitments at pages
6  1017 through 1019. He stated that he was on a call with
7  Paramount where he was told about a management change and that
8  what he recalled most was that the management change was not a
9  result of malfeasance and that also Paramount intended to
10  continue business as usual but it's unclear to this Court how
11  this statement could be taken as any sort of commitment to any
12  sort of rational business that it would never change any
13  practice and that it would commit thereby to entering into the
14  same types of co-financing presale arrangements as it had in
15  the past, presumably on favorable terms because presumably the
16  plaintiffs are not asking that Paramount enter into
17  co-financing relationships through foreign presales that were
18  less favorable. But of course that could have occurred too.
19  They could have been less favorable. Because of course
20  entering into foreign presale agreements for the sake of it is
21  not what they seek.
22       Their claim is premised on the assumption that
23  Paramount could enter into a similar number of agreements in
24  the same territory on the same or better terms, at least in
25  terms of the HDS average. Otherwise the unfavorable terms of a

**ALLIANZ RISK TRANSFER, INC. et al., v.**
**PARAMOUNT PICTURES,**

**October 30, 2014**

EAUFALL7          Decision          Page 1626

1  foreign presale wouldn't help.
2      Now, Newstar's Burnaman also testified that he was not
3  contending there was any fraud in the HDS, that is, that the
4  numbers there were untrue.
5      The plaintiff spent a fair amount of time on Moody's,
6  the rating agents. They're irrelevant, frankly, to the Court.
7  The communications do not help the fraud claim. The fact that
8  the reasonable, these sophisticated investors would go to
9  Moody's for purposes of materiality the Court does not find to
10  be persuasive. Moody's asked for all kinds of information and
11  it cannot be that every data point that Moody's ever receives
12  is considered itself material by virtue of having been received
13  by Moody's and I'll come back to that. But there's no
14  evidence, frankly, that anyone at Paramount intentionally and
15  knowingly defrauded Moody's with the intention of having
16  Moody's act as a proxy to defraud the investors.
17      The Court also refers to DX 35 and DX 49 received by
18  Newstar and other investors pre-investment showing that
19  co-financings for the films on the Melrose slate were running
20  significantly behind historical averages. This clearly has
21  implications for reasonable reliance which I'm going to get to
22  in a moment, but in addition it disproves at the time that the
23  alleged misstatements were made in the PPM that they were known
24  to or even believed to be false because the very business
25  practices at issue were either being implemented or not.

EAUFALL7          Decision          Page 1627

1  Witnesses have repeatedly testified that they ignored this
2  information other than for the purpose of obtaining the names
3  of films on the slate because they read the disclaimer on the
4  front which indicated that the numbers were not final.
5      Well, of course number could not be final until all
6  revenues associated with the Melrose slate had been obtained
7  years in the future and all production and other costs had been
8  incurred. Until then the numbers associated with costs and
9  with revenues and ultimately with profitability and return
10  could and would change. That's just a fact of how businesses
11  operate. The Court does not find credible that all of these
12  highly sophisticated businessmen having information as to the
13  co-financing levels at their disposal pre-investment would have
14  ignored it if they truly cared about it. It was simply, as to
15  be further discussed in a moment, not material to them.
16      Investors should have been tracking any information
17  that was of importance. In all events, the updates to the
18  Melrose slate in these documents indicate that Paramount was
19  not hiding its business practices from the plaintiffs. It was
20  disclosing them. The statements could not be false as a
21  result.
22      Allianz's Flynn received information on the investment
23  showing a high variable in co-financing -- that's DX 133 --
24  that the film slate was over budget. That's also DX 133. And
25  that Paramount generally retained worldwide rights. That's

EAUFALL7          Decision          Page 1628

1  also DX 133. He also testified at page 590 that he did not
2  receive guarantees from Paramount and Maslansky, who
3  represented Allianz along with Munich Re, testified that
4  Paramount had not committed to selling a certain number of
5  foreign presales at page 435 and that there was no commitment
6  in the PPM or the subscription agreement by Paramount and
7  that's at page 440.
8      And here's some additional evidence. PX 116, the
9  investment price invoice, shows territorial presales for the
10  four films released as of mid-July and no co-financing for two
11  of the films. That's a disclosure of actual business
12  practices. PX 154 shows that Munich Re and other investors had
13  received information on the levels of co-financing
14  pre-investment.
15      252, DX 252, in July Munich Re received information
16  that levels of co-financing were running behind. And also 162,
17  DX 162.
18      PX 612 reveals that Newstar itself knew that none of
19  the alleged statements were false or binding promises. In the
20  memo there that was prepared by Dechert it notes that Paramount
21  has, quote, "significant discretion and authority with respect
22  to the revenue stream," end quote. This was not qualified with
23  anything like "something along the lines of" but they are
24  committed to entering into certain numbers and types of
25  co-financing deals. The Dechert memo also notes there is no

EAUFALL7          Decision          Page 1629

1  covenant in the documentation that requires Paramount to
2  keeping skin in the game. Interestingly, the way that this
3  reads is that the selling of rights was more of a concern than
4  a retention of rights and that there was a concern by Dechert
5  that by keeping skin in the game by retaining rights, that
6  would be preferable. In either event, there's nothing which
7  calls out foreign presales or co-financing as any kind of issue
8  that should be specifically mentioned.
9      PX 613, the Newstar credit analysis memo, recites
10  risks. The fourth risk is that Melrose has no input into the
11  marketing and distribution of covered pictures. There's also
12  PX 389 where Munich Re participated in a meeting in which it
13  understood that Paramount retained all worldwide or domestic
14  rights it was differentiated in 16 films. Maslansky, who
15  represented Munich Re as well as Allianz, used speculation to
16  back out what he believed were foreign presale numbers from the
17  co-financing. But it's notable he didn't ask for additional
18  information in this regard. He testified he believed he had
19  sufficient information to perform the analyses which his
20  clients requested that he performed. He also testified that DX
21  203 didn't raise any concerns.
22      In DX 212 and DX 209, which he received, they showed
23  both of them a possible loss investment. Maslansky testified,
24  as I've said, that there was never any commitment and that's in
25  DX 204 that presales were running at a rate that was 50 percent

ALLIANZ RISK TRANSFER, INC. et al., v.
PARAMOUNT PICTURES,

October 30, 2014

EAUFALL7          Decision          Page 1630

1  lower than historically.
2       I do want to mention Court Exhibit 3 which is the
3  plaintiff's demonstrative, the document which they say that the
4  proof is in the pudding -- that's my words and not
5  plaintiffs -- and that there were no deals done post PPM. But
6  there's a lack of evidence and indeed I should say there's
7  affirmative evidence in the record through the deposition
8  designations that there were deals being pursued
9  opportunistically. I have no information that suggested that
10 is not true. The fact that nothing happened does not mean that
11 nothing was tried. That's also consistent with what Ms. Magid
12 had testified to.
13      Now, Maslansky also testified that he never asked for
14 a commitment to operate in the same manner. He wasn't sure
15 that he'd ever asked for such a commitment. Hohmann testified
16 he did not receive any specific reps regarding risk mitigation
17 plans by Paramount and that's consistent with Maslansky. The
18 same is true for Allianz's Flynn, for Newstar's Burnaman, that
19 they were not made promises or guarantees.
20      Springer never asked for specific assurance regarding
21 foreign presales. That's at page 1252. He didn't consider
22 getting a rep. That's 1272. At 1254 he said he understood
23 that there was no assurance that Paramount wouldn't implement
24 the same co-financing techniques.
25      The Court also would refer to PX 850, 851, 838 and

EAUFALL7          Decision          Page 1631

1  864. And I would mention PX 343. I would say that PX 343,
2  there's nothing -- going back to the testimony there's nothing
3  that allows the Court to interpret it as the plaintiffs would
4  have. I don't think it would, frankly, change the result given
5  the weight of the evidence and it certainly I don't think does
6  anything in terms of falsity or scienter given the weight of
7  the evidence.
8       Now, in terms of omission, plaintiffs also allege that
9  if they didn't make, that in terms of the PPM that there are
10 actionable omissions that the PPM makes statements and
11 therefore what is omitted, which is a change of business
12 strategy, a determined change of business strategy, leads to a
13 deception. But the law is clear in securities fraud cases that
14 you have to set forth in your complaint what it is you're
15 seeking and it is true that you can conform evidence to the
16 proof at trial. But in securities fraud cases you're really
17 supposed to do something that's different under Rule 9b.
18 You're supposed to put down with specificity the actual
19 statements and omissions and there's lots of law on that and
20 for that reason alone the Court could refuse and if I were
21 charging a jury I would refuse to charge the omissions.
22 Nevertheless, I have looked at them here and I don't find that
23 there are any omissions, any actionable omissions.
24      Plaintiffs claim that Paramount omitted to disclose,
25 as I said, that at the time of the securities offering that it

EAUFALL7          Decision          Page 1632

1  had already decided not to engage in the same level of foreign
2  presales as it had in the past and that they say this is
3  demonstrated through two documents. The first is the retained
4  foreign rights PowerPoint and the second is the June 2003
5  Lakeshore memo. The second is at PX 218. But there is no one
6  who makes the retain more foreign rights PowerPoint into a
7  smoking gun or to indicate that it reveals a fraud. There's no
8  connection to following action, to action which followed which
9  was a decision made at that point. There's no causation that's
10 tied to that statement and any following business practice. It
11 doesn't say in that document that Paramount will not engage in
12 any foreign presales. It does not state that it will not
13 engage in any co-financing. It simply says they're going to
14 retain more rights.
15      That's well within their business judgment to decide
16 which rights they want to retain, how many they want to retain.
17 From year-to-year in the past they had retained more rights in
18 some years and not retained more rights in other years and
19 that's the variability I discussed before.
20      In the June 2003 Lakeshore memo it does not suggest
21 that Paramount was dropping its risk mitigation. Lakeshore was
22 a specific transaction, and, really, it does not, you can't
23 take the PX 218 and transpose it on to the entire Melrose slate
24 and suggest that it is a demonstration that all foreign
25 presales stopped.

EAUFALL7          Decision          Page 1633

1       Now, as a matter of law, an admission in any event is
2  not actionable even if there are any -- unless a defendant is
3  under a duty to disclose certain information or if the
4  information is peculiarly within its possession. Now, here
5  there is no duty to disclose and as I've said the information
6  on all of the facts about foreign presales was disclosed to the
7  plaintiffs themselves including the slow number of foreign
8  presales that was occurring with respect to the Melrose slate.
9  So it was not peculiarly within their, only their possession.
10      Now, under the Chiarella case, 445, U.S. 222, that's a
11 case which talks about typically a duty to disclose arises when
12 you're a fiduciary. Notably, most of the communications here
13 are with Merrill Lynch, but plaintiffs don't claim that Merrill
14 Lynch ever misled them in any way. The facts adduced by the
15 defendant at trial make it clear that as of April 2004 Merrill
16 Lynch had been told that Paramount intended to maintain
17 distribution rights for more of its films than it had in the
18 past. It had that information. The facts just don't support,
19 also do not support a duty to disclose.
20      There's no evidence that Paramount had any kind of
21 fiduciary relationship, it had no special relationship with
22 plaintiff as a matter of law. In fact, the subscription
23 agreement and the PPM disclaim disclosure obligations and those
24 disclaimers are binding and there was also a disclaimer of any
25 fiduciary obligation.

ALLIANZ RISK TRANSFER, INC. et al., v.
PARAMOUNT PICTURES,

October 30, 2014

EAUFALL7                Decision                Page 1634

1      The alleged omission here also was not an omission.
2  It's in effect an allegation of fraud by hindsight. Plaintiffs
3  now wish they had had more information.
4      But the Paramount witnesses testified there was no
5  change of business strategy in 2004. Lansing testified to
6  that, Tobey testified to that, Friedman testified to that,
7  Magid testified to that, and the PPM itself contained a
8  disclosure that its parent and itself had publicly come out in
9  favor of additional risk.
10      In addition, the plaintiffs also received the
11 investment invoices at what I believe is PX 116 or it's DX 116.
12 That also indicates information which proves that there was no
13 omission because the very information sought was disclosed.
14      So let's turn to materiality. A material statement or
15 omission is material if there's a substantial likelihood that a
16 reasonable investor would consider the fact misstated or
17 omitted important in connection with a contemplated securities
18 transaction. That's the Basic case, 485 U.S. 224; the
19 Castellano Young & Rubicam case, 257 F.3d 171; the Azrielli v.
20 Cohen Law Offices case at 21 F.3d 512.
21      Put another way, a misstatement or omission is
22 material when there's a substantial likelihood that the
23 disclosure of the omitted fact would have been viewed by the
24 reasonable investor as having significantly altered the total
25 mix of information available and of course that's the basic

EAUFALL7                Decision                Page 1635

1  case. Materiality is defined by an objective standard based
2  upon the significance that an omitted fact or misrepresentation
3  would have to a reasonable investor. And when contingent or
4  speculative future events are at issue the materiality of those
5  events depends on balancing of both the indicated probability
6  that the event will occur and the anticipated magnitude of the
7  event in light of the totality of company activity. That's the
8  Castellano case at 257 F.3d at 179.
9      And, of course, touting good risk controls has been
10 found to be inactionable puffery. That's the EGA and Local 134
11 IBEW case 553 F.3d at 206. Also the Ramback case at 355 F.3d
12 at 174.
13      Materiality is prospective, not retrospective and
14 materiality is not determined by a single event. Materiality
15 is determined as of the date plaintiff entered into the
16 securities transaction at issue. See also in addition to the
17 other cases the Radiation Dynamics case, 464 F.2d 876 at 890,
18 891.
19      The evidence does not support that business practices
20 with respect to foreign presales was material to plaintiffs.
21 More affirmatively, the Court finds it was not material.
22 First, plaintiffs were sophisticated investors. If they wanted
23 a rep they had to get a rep. Indeed, one of the investors,
24 Mr. Burnaman himself, had testified on reps and warranties and
25 there were reps and warranties involved in some of the

EAUFALL7                Decision                Page 1636

1  documents that they themselves signed. They knew how to get
2  them, they knew how to give them and they could have asked for
3  them here. Now, it's not the cake and eat it too issue because
4  if they asked for a rep and they didn't get it they would have
5  that information. They could then factor that into whether or
6  not they wanted to invest. If without a requested rep they
7  determined they were unwilling to proceed, that was within
8  their control. And that's the purpose of asking for a rep.
9      Not so that they -- there's nothing that bound them to
10 proceed with this transaction. They weren't required, there
11 were other places to put their money at that time. So the
12 Court does look at the plaintiffs in terms of as investors, as
13 reasonable people and what they saw as material the Court does
14 view as indicative among other factors as what's material.
15 They saw the disclaimers but did not drill down on how those
16 disclaimers applied to foreign presales. That indicates to the
17 Court that foreign presales were not of particular importance
18 to them. Their failure to drill down on the information they
19 received undercuts a finding of materiality.
20      The Court also refers to PX 44, DX 76 where there's no
21 focus on foreign presales at all. None of the plaintiffs
22 sought to drill down. There's a fair amount of evidence
23 supportive of lack of materiality of foreign presales in the
24 record or even really of foreign co-financing more generally.
25      Newstar's Dechert memo, again, at PX 613 talks about

EAUFALL7                Decision                Page 1637

1  the three drivers that they were looking at as being production
2  costs, lifetime revenues and P&A. Those general categories no
3  doubt as general categories were important, but foreign
4  presales was not pulled out with any kind of specificity.
5  Newstar's Burnaman did not have a particular level of foreign
6  presales in mind, just risk mitigation generally. That
7  undercuts the materiality of foreign presales.
8      DX 39, plaintiff saw presales were running behind. If
9  it was material they should have asked followup questions or
10 even noted it in documentation. They did not.
11      DX 76, the investment committee minutes for Newstar.
12 It's a synthesis, as we heard, of the major work and thinking
13 leading to the investment decision, but there's nothing about
14 foreign presales or co-financing, foreign co-financing in
15 there. It's simply an input into other numbers.
16      PX 655, Munich Re makes a business recommendation and
17 in its memo does not mention foreign presales or any particular
18 form of risk mitigation relied upon. Indeed, they testified
19 they never asked for any kind of breakdown. That's 1107.
20      Marathon's Springer testified that a change in risk
21 mitigation practices would have been material but this
22 contrasts to the fact he never asked for a rep on that, never
23 stated that a particular risk mitigation, e.g., foreign
24 presales was material. PX 521, PX 505 and PX 524 and related
25 testimony to those documents indicate that none of the

**ALLIANZ RISK TRANSFER, INC. et al., v.**
**PARAMOUNT PICTURES,**

October 30, 2014

| EAUFALL7 | Decision | Page 1638 |
|---|---|---|

1 plaintiffs had asked for foreign presale breakouts for the HDS
2 or the Melrose slate. They never pressed it and that undercuts
3 materiality.
4     Flynn at page 606 says he doesn't recall asking for a
5 breakdown. Page 511, he did not model it. Marathon asked for
6 some additional information, but once the information was
7 negotiated there hadn't been in the beginning and then there
8 wasn't by the time they were done with negotiations any
9 reference to foreign presales.
10     Maslansky did not stress the model for foreign
11 presales. All of those undercut materiality. PX 521 also sets
12 forth information that Marathon was seeking, as I've said, but
13 there was never any followup and importantly, Springer did ask
14 for additional runs by Merrill Lynch of the modeling, but never
15 asked for a run on foreign presales. In short, if foreign
16 presales were important to plaintiffs at the time that they
17 entered into the Melrose transaction versus hindsight, they
18 have not demonstrated that.
19     Moody's, I should state for a moment -- let me just
20 pause on Moody's. Moody's cannot be used as a definition for
21 materiality, not at least in the way the Moody's information
22 was put forward. There's no law which says that Moody's or any
23 of the rating agencies, that everything they asked for is ipso
24 facto material. They asked for a lot of data, and not every
25 piece of which is assumed to be material.

| EAUFALL7 | Decision | Page 1639 |
|---|---|---|

1     Let's turn to scienter. As we all know, to establish
2 liability under Section 10b and Rule 10b-5 a private plaintiff
3 has to prove that a defendant acted with scienter. And
4 scienter is a very serious and rigorous standard. Scienter is
5 the state of mind of somebody trying to defraud another, trying
6 intentionally to mislead another in connection with a
7 securities purchase or sale. It's the mental state embracing
8 the intent to deceive, to manipulate or defraud. It's the
9 Tellabs case, 551 U.S. 308, which quotes, of course, the Ernst
10 & Young case, Ernst at that time case, 525 U.S. 185. The City
11 of Pontiac case has got a more recent discussion of that of
12 scienter by the Second Circuit at 752 F.3d at 185 to 86. There
13 disclosures of the very information sought or alleged to be
14 misleading undercuts scienter.
15     The Court has to consider all of the facts alleged and
16 determine whether or not there is sufficient scienter. First
17 of all, as you know, I have already found that there was
18 truthful disclosure. Therefore there was by definition, there
19 has been a finding by me of no intent to mislead. But in any
20 event, even if I were to assume that there were facts
21 indicating some material misstatement or omission, which I have
22 not found, I would still find on its own independently of those
23 things that there was no scienter.
24     First of all, I still don't understand who precisely
25 is supposed to have intended to defraud the plaintiffs. It

| EAUFALL7 | Decision | Page 1640 |
|---|---|---|

1 seems to be that the theory is it was the company generally but
2 I don't know who was around that table with a smoky room
3 intending to defraud and what their possible motivation was.
4 Because you would think that if Paramount was doing the first
5 slate deal ever with Merrill Lynch that they might want to do
6 another one rather than just cut off their nose to spite their
7 face at the very first one by defrauding people at the outset.
8 And certainly there's I think no allegation, there couldn't be,
9 that Paramount sought to tank its own films. It clearly wanted
10 success. There's no indication that it did not want
11 plaintiffs' investment to succeed. Those undercut scienter.
12     It would seem that if Paramount decided to retain
13 foreign presales and the Melrose slate had done well that
14 plaintiffs would have benefited greatly. In that regard,
15 Paramount intended to make a win-win situation, to the extent
16 that it retained foreign rights it intended to have a win-win
17 situation. It turned out to be lose-lose, but that's in
18 hindsight. That's a failed business judgment, not fraud, and
19 the business judgment traces back film-by-film, it doesn't
20 trace back to an entire slate. Scienter, really, here is not
21 shown.
22     Plaintiffs argue that scienter is apparent in the
23 actual numbers and the failure to acknowledge the truth, but I
24 view this evidence differently. I don't find any evidence from
25 any Paramount witness whose testimony was designated or

| EAUFALL7 | Decision | Page 1641 |
|---|---|---|

1 Ms. Magid who testified at trial that could conceivably lead to
2 an inference that Paramount planned to defraud plaintiffs by
3 not telling them this one very specific fact which Paramount
4 had decided to retain more foreign rights and not engage in
5 foreign presales. The evidence I find is to the contrary. The
6 evidence supports Paramount wanting the films in the slate to
7 do well and there's testimony in the designated depositions to
8 that in that regard. There was no view that the films were
9 known before they even were released or the first four at
10 release that they were losers and in fact Mean Girls did quite
11 well, relatively speaking. There was hope that they would all
12 do well. As Friedman said in his deposition, Paramount could
13 experience the upside as well as the downside with various
14 kinds of presales. So Paramount would have, but also by
15 retaining rights Paramount could experience the upside. And
16 therefore could so plaintiffs.
17     So what evidence do plaintiffs have? Paramount has
18 disclosed a lot of information which I referred to which
19 undercuts scienter. Disclosing information, as I've said in PX
20 532, PX 202, it disclosed in fact that Paramount was going to
21 retain more foreign rights. It disclosed the expected
22 co-financings in PX 252, DX 49, DX 202, DX 116, PX 389. So
23 there was disclosure of what was and was not happening and the
24 absence of foreign presales was there if anyone chose to open
25 their eyes to see it.

**ALLIANZ RISK TRANSFER, INC. et al., v.**
**PARAMOUNT PICTURES,**                                                           **October 30, 2014**

| EAUFALL7          Decision          Page 1642 | EAUFALL7          Decision          Page 1644 |

1   The main evidence relates to statements that Paramount
2   was not intending or did intend to fundamentally change its
3   business strategy. But this is, as I've said before, been
4   shown to be false. There was no evidence that anyone at
5   Paramount believed that by not engaging in foreign presales
6   they were engaging -- that was a fundamental change in business
7   strategy. Let me state that again. There's no indication that
8   whether or not for 20 films or 25 films foreign presales and
9   agreements were entered into was itself a fundamental change in
10  Paramount Pictures' business strategy.
11       Plaintiffs point to the McGrath memo, the e-mail
12  regarding no fundamental change which occurred after the PX 330
13  which was the Wall Street Journal article but that's not been
14  shown to be false. It is certainly insufficient standing alone
15  to establish an intent to defraud. There are disclaimers
16  language and the no-assurances language in the PPM, it's all
17  over the place, all of the disclaimers in the Monte Carlo,
18  everything else that we've talked about. That one statement by
19  McGrath that is so vague and general cannot overcome all of
20  that.
21       Plaintiffs have also failed to show through
22  circumstantial evidence that anyone at Paramount had the intent
23  to deceive. Hoffman testified he wasn't aware of any attempt
24  to mislead and did not believe he himself had been misled. He
25  testified that Paramount in fact appeared to be fully

1   Capital at 343 F.3d at 189. It's the Castellano case at 257
2   F.3d at 179. And to make this determination Courts consider
3   the entire context of the transaction, including factors such
4   as complexity, magnitude, the sophistication of the parties and
5   the content of any agreements between them as well as whether
6   or not reliance was reasonable and that's the Emergent case at
7   343 F.3d at 195. And I've considered these factors.
8        I find that there was no actual reliance and no
9   reasonable reliance. There's no evidence that any plaintiff
10  had any actual reliance on a particular level of foreign
11  presales or type of, particular type of risk mitigation
12  technique or a particular type of co-financing. But in any
13  event reliance was not reasonable. These were sophisticated
14  investors who knew how to evaluate risky deals and knew how to
15  protect themselves when they wanted to do so.
16       Now, the law is clear, I think quite clear that a
17  specific disclaimer may certainly put a plaintiff on notice of
18  the unreasonableness of his reliance on a particular
19  representation, and that's the Harsco case, 91 F.3d 337 at 342.
20  There's a long discussion there which talks about, quote, "An
21  investor may not justifiably rely on a misrepresentation if
22  through minimal diligence the investor should have discovered
23  the truth."
24       There's also the Brown v. E.F. Hutton Group case, 991
25  F.2d 1020 at 1022, which references that plaintiff failed to

| EAUFALL7          Decision          Page 1643 | EAUFALL7          Decision          Page 1645 |

1   forthcoming and as of today he does not think he's been misled.
2   And the evidence is that Paramount according to Hoffman did
3   attempt to provide truthful information.
4        He knows about the McGrath memo. Hoffman for Merrill
5   Lynch also testified credibly that he used other sources to
6   confirm the accuracy of information contained in the PPM and
7   that therefore he had an external source for at least some of
8   it. And no one at Paramount asked Merrill Lynch not to provide
9   accurate information. There's no evidence from Burnaman, from
10  Springer, from Flynn or from Hohmann that anyone at Paramount
11  had the requisite intent. There's no person who's been shown
12  to have made a misrepresentation or omitted something with
13  intent to defraud.
14       Now, a word on the Affiliated Ute presumption. As a
15  matter of law I find it does not apply. As a matter of fact I
16  find it does not apply. So we're going to go into reliance and
17  I do not find that the Affiliated Ute presumption is applicable
18  as a matter of fact or law. However, there's no basis for
19  reliance under any circumstances to establish a violation of
20  10b-5.
21       If we would go on to the next element, which is
22  reliance, a plaintiff must prove by a preponderance of the
23  evidence transaction causation which is also usually known as
24  reliance. That's the Dura case, it's 544 U.S. at 346. It's
25  the Lentell case at 396 F.3d at 172. It's also Emergent

1   establish justifiable reliance in light of warnings and
2   disclosures in the prospectus. There's the Danann Realty case,
3   157 New England 2d 597, which is a New York Court of Appeals
4   case, 1959 and there are other cases which stand for the same
5   proposition.
6        So in fact you can disclaim your way out of fraud and
7   there is no fraud here so that's not the issue. But you can
8   disclaim your way out of misrepresentation based upon all of
9   the facts and the circumstances in a case, based upon the
10  sophistication of the investor, based upon what work that
11  investor could have done to understand the misrepresentation.
12  Here the work that they needed to have done they never began to
13  do. They didn't model foreign presales. They didn't dig down
14  into foreign presales. They relied upon Maslansky who backed
15  it out based upon speculation. The information that they had
16  related to co-financings demonstrated running behind at
17  historical levels. If they wanted to dig down they could have.
18  They didn't.
19       Now, disclaimers and disclosures make any reliance on
20  the foreign presales and other particular types of risk
21  mitigation strategies unreasonable. I have reviewed all the
22  disclaimers and disclosures and I'm not going to do it again
23  now, but as we know Springer said he would use similar language
24  in his PPM and rely upon it to insulate him from risk. It's
25  reasonable for one to do that. It's reasonable for a company

**ALLIANZ RISK TRANSFER, INC. et al., v.**
**PARAMOUNT PICTURES,**                                                   October 30, 2014

| EAUFALL7          Decision          Page 1646 | EAUFALL7          Decision          Page 1648 |

**Page 1646**

1 to rely upon that.
2       In addition to disclaimers here, however, there was
3 affirmative information given to the plaintiffs that made any
4 reliance on their belief that there was going to be a
5 particular type of co-financing unreasonable, and that includes
6 things such as that UIP, generally distributes the film, that
7 Paramount retains all rights and makes all decisions related to
8 distribution. So fundamentally it is unreasonable for
9 plaintiffs to have relied given all of this evidence. But the
10 evidence is also that they didn't actually rely, that this is
11 in the Court's view classic fraud by hindsight and I'll walk
12 through briefly some of that evidence.
13       That in advance of the investment the evidence is that
14 the plaintiffs as we know never broke out foreign presales from
15 other numbers. There's no evidence that achieving the
16 historical level of foreign presales in particular was
17 determinative of whether any of them would invest or not. I'm
18 sure they wish they hadn't invested for all kinds of reasons,
19 but nobody was ever asked -- I'll continue.
20       Indeed, the documents introduced at trial demonstrate
21 if plaintiffs relied on a particular level of co-financing or
22 foreign presales such reliance was unreasonable because the
23 documents established that plaintiffs were shown information in
24 DX 5, DX 49, PX 613 about where foreign presales were run.
25       Now, let's walk through some of the testimony.

**Page 1648**

1       Munich Re saw and read the PPM. They had no direct
2 communications. They relied on Maslansky. Munich Re also said
3 they had not received assurances. Hohmann separately did not
4 have any direct conversations with Paramount. The person who
5 may have, Hanf, did not testify and there were no deposition
6 designations but there was her memo which appears to indicate
7 no actual reliance.
8       PX 655, Munich Re's business recommendation, does not
9 mention foreign presales. Munich Re also received the
10 additional slate information in DX 252 and DX 162 undercutting
11 actual reliance.
12       Marathon's Springer testified that Marathon's business
13 was in the high yield or riskier investments area and that he
14 knew that there was no assurance of the same co-financing level
15 or a particular risk mitigation technique. That undercuts
16 reliance. He did not speak with anyone directly at Paramount
17 regarding the HDS and had no basis to rely upon the accuracy of
18 the data. Flynn for Allianz also recognized the possibility of
19 a loss and did not model foreign presales. Also the investors
20 all saw the caveats in the subscription agreement which
21 undercuts any kind of reliance. And it was unreasonable to
22 rely upon Moody's for any assurance that Paramount would
23 conduct its business in any particular way. That would be
24 unreasonable.
25       It was unreasonable to rely on the HDS as predicting

| EAUFALL7          Decision          Page 1647 | EAUFALL7          Decision          Page 1649 |

**Page 1647**

1 Alliance Flynn said he never received any guarantees. That
2 undercuts his actual reliance. He never asked for information
3 that wasn't actually provided. That undercuts reliance. He
4 said co-financing was important, but he did not say what
5 particular level of foreign presales was important or that he
6 had sought that information. Nor was he asked, frankly, that
7 he ever had any decision-making authority.
8       In the designations of Seery who was I believe the
9 Allianz decision maker, he similarly testified that he wasn't
10 given any guarantees. Neither Flynn nor Seery was asked and
11 didn't testify that a particular type of risk mitigation
12 strategy was something they had particularly relied upon in
13 entering into the transaction.
14       Newstar and the other plaintiff witnesses testified
15 that Paramount's business strategy was important to Newstar in
16 evaluating and deciding whether to proceed but of course this
17 only states the obvious. Risk mitigation, one would expect
18 every business to do some of that, but particular forms of risk
19 mitigation committed to is something very different. Newstar's
20 Burnaman testified he was not expecting a particular level of
21 foreign presales. That undercuts reliance. No one spoke to
22 Newstar about co-financing or levels of co-financing.
23 Newstar's Burnaman also could not recall anybody at Merrill
24 Lynch told him that Paramount had committed to any particular
25 level of co-financing.

**Page 1649**

1 future results or future business practices, particularly in
2 light of the disclaimers. And the plaintiffs were unreasonable
3 in not obtaining reps. It was unreasonable to ignore the
4 disclaimers on PX 898, the Monte Carlo. It was unreasonable to
5 ignore PX 655 which acknowledged a 25 percent possibility of
6 loss. And it was unreasonable to assume a different pattern of
7 co-financing than that evident in PX 162 and PX 563 and it was
8 unreasonable to ignore that UIP which had significant costs
9 associated with it and was also referenced as the entity which
10 generally handled distribution outside the U.S. would suddenly
11 disappear.
12       Now let's turn to loss causation. A plaintiff in a
13 10b-5 action has the burden of proving loss causation which is
14 the causal link between the alleged misconduct and the economic
15 harm ultimately suffered by the plaintiff and that's the
16 Lentell case, 396 F.3d at 172. Plaintiff has to prove that the
17 act or omission of the defendant caused the loss and that's in
18 the statute. A misstatement or omission is the proximate cause
19 of an investment loss if the risk that caused the loss was
20 within the zone of risk concealed by the misrepresentation or
21 omission alleged by a disappointed investor. That's the
22 Lentell case again.
23       Now, to establish causation a plaintiff has to show
24 both that their alleged loss was foreseeable and that it was
25 caused by materialization of the concealed risk. That's the

ALLIANZ RISK TRANSFER, INC. et al., v.
PARAMOUNT PICTURES,

October 30, 2014

| EAUFALL7 | Decision | Page 1650 |
| --- | --- | --- |

1 Lentell case, the Emergent Capital case and there has to be
2 that specific causal connection.
3     In the Dura case the Supreme Court talks about
4 proximate cause, but the proximate cause linkage for causation
5 is set forth in numerous cases in the securities fraud and
6 fraud area generally. Plaintiffs here have failed to show loss
7 causation by a preponderance of the evidence. It does require
8 a causal link. That link can't be assumed. It can't be merely
9 possible. There can't merely be a connection. It has to be
10 causal. In this case, it means that plaintiff's loss had to
11 have been caused and there can be more than one contributing
12 factor for proximate cause, but you've got to do something to
13 show that it's the proximate cause, not that it's simply
14 connected to. So there would have to be something, for
15 instance, that the foreign territorial sales would have to
16 exceed the foreign self distribution receipts, but there's no
17 evidence of that. They would have to show that there is
18 something which differentiates what happened with foreign
19 presales in terms of the numbers from the various numbers run
20 for the other revenue items. For instance, the Monte Carlo.
21 It ran 10,000 different permutations. I won't go into it, but
22 lots of things one could have done with that Monte Carlo that
23 weren't done.
24     So the question is whether the failure to enter into
25 additional foreign presales caused the plaintiffs' loss. Now,

| EAUFALL7 | Decision | Page 1651 |
| --- | --- | --- |

1 that's different from saying if you add in a foreign presale
2 number does it goose up your number and therefore if you goose
3 it up high enough to the plaintiffs recover. That's not the
4 same thing. It's proximate loss causation, not connection.
5 Otherwise any revenue diminution or addition could in one way
6 or another be found to be proximate and that's not what the law
7 provides for proximate cause.
8     In addition, there's evidence in the record that based
9 on the Melrose slate and the HDS that the average production
10 costs of the Melrose slate was higher and that receipts were
11 lower. That undercuts a finding of proximate cause. That's DX
12 6, PX 899.
13     There's no reference to larger macro economic factors.
14 Indeed, each of the territories would have to be examined for
15 the macro economic factors. You can't just assume it, you
16 can't assume it as Fier does, as if it could have occurred,
17 because there's no evidence in the record that there were any
18 particular deals that were in a particular territory that were
19 there as low-hanging fruit for the taking. So it's just
20 speculation that those deals with certain revenue numbers could
21 have occurred and that those revenue numbers would have been
22 good enough to have overcome whatever low level of self foreign
23 distribution revenues were otherwise obtained. That would have
24 had to occur and it didn't.
25     There's testimony in the record that there can be many

| EAUFALL7 | Decision | Page 1652 |
| --- | --- | --- |

1 reasons for a film's success or failure, box office success
2 being a primary driver of success everywhere, certainly in
3 terms of a foreign jurisdiction.
4     There has to be evidence that the guarantee plus
5 overage that was embedded into the historical numbers could
6 have been obtained. If it's a box office flop you're not going
7 to get the overage. You might get the guarantee, but there's
8 no evidence you'd get the overage. As I understand the
9 numbers based upon the evidence at trial, the information on
10 what was obtained in the past was the information, it was what
11 was received. That contained the revenues received for those
12 co-financings. That over time would, I would assume on a
13 trailing level, embody and incorporate overage. If you've got
14 a flop you're not going to have that overage. Therefore, it's
15 not just a guarantee number or if it is that guarantee number I
16 don't have that information to draw that out. So I don't have
17 specific information and I don't find there's any loss
18 causation.
19     In terms of common law fraud, the Engle case in New
20 York which is the 983 NY Supp 2d 630, New York App. Div. 2014
21 sets out the elements under New York law the elements of fraud
22 are narrowly defined, requiring proof by clear and convincing
23 evidence. Even if it was by a preponderance, this plaintiff's
24 claims still would not meet it under any standard. The Gaidon
25 case, at 725 NE 2d 598, that's 607, stands for that.

| EAUFALL7 | Decision | Page 1653 |
| --- | --- | --- |

1     Omissions do not exist really in New York State fraud
2 claims, but even if they did the Court's finding would be the
3 same as I've already stated for securities fraud. That's the
4 Mandarin Trading case, 944 NE 2d 1104 at 1108, that's New York
5 2011. And also in New York, you're also to look at
6 sophisticated businessmen and determine whether or not they
7 could have been defrauded in the manner suggested and it's just
8 not credible to the Court that they could have been. Not these
9 guys. Not the guys who testified in front of me. They were
10 very sophisticated. I would say they knew what they were
11 doing.
12     Disclaimers also under New York law where a plaintiff
13 has announced and stipulated that it's not relying on any
14 representation which is contained in the disclaimer, in the
15 very manner which now claims to be defrauded, the specific
16 disclaimer destroys plaintiffs claims. You can disclaim fraud.
17 Let's put it differently. You can rely, you can agree to a
18 disclaimer which precludes a later claim of fraud. That's the
19 Danann case, 157 NE 2d 259-7602.
20     So for all of the reasons set forth above and under
21 the New York law, the Court does find the plaintiffs have not
22 proven fraud under New York law by either a preponderance of
23 the evidence or clear and convincing evidence.
24     In terms of unjust enrichment, the elements of that
25 cause of action are set forth in the Mandarin case, 944 NE 2d

**SPA-18**

ALLIANZ RISK TRANSFER, INC. et al., v.
PARAMOUNT PICTURES,                                                          October 30, 2014

| EAUFALL7 | Decision | Page 1654 |
|---|---|---|

 1  at 1110, which also it's worth taking a look at the Citibank
 2  case at 12 AD 3rd 480 at 481.  The elements are set forth
 3  there.  You've got to show that the party was enriched at
 4  another party's expense.  I don't find here based upon all that
 5  I've said that the other party here was enriched at their
 6  expense.  Expense incorporates not only a concept of literal
 7  dollar flows of who were the winners and who were the losers,
 8  but whether the winner and the loser, there's an element there
 9  that goes beyond just win/loss and it goes into equity and
10  whether an equity in good conscience the other party should be
11  permitted to recover and I don't find that the equities here
12  are in plaintiff's favor.
13        So for all of those reasons, the defendant's motion is
14  granted.  Judgment is entered.  The Court will put out a
15  one-paragraph order that will enter judgment for Counts One
16  through Three of plaintiff's complaint.  That will occur
17  tomorrow for purposes of any subsequent actions in the case.
18  Otherwise, I believe it's fully resolved and terminated.
19        MR. ARFFA: Thank you very much, Judge.
20        THE COURT: Thank you.  We're adjourned.
21        (Adjourned)
22
23
24
25

| EAUFALL7 | | Page 1655 |
|---|---|---|

 1              PLAINTIFF EXHIBITS
 2  Exhibit No.                          Received
 3   198, 221 and 255  . . . . . . . . . . . . . .1442
 4   318 and 877   . . . . . . . . . . . . . . . .1442
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25